ELLIS GRAY MILLING COMPANY, a partnership composed of ELLIS GRAY and MARIE B. GRAY, Appellants, v. FRANK M. SHEPPARD and WILLIAM W. SHEPPARD, doing business under the fictitious name of the PIKE GRAIN & SECURITIES COMPANY, Respondents, No. 41346 —222 S. W. (2d) 742.

Court en Banc, June 13, 1949.

Rehearing Denied, July 30, 1949.

506

*Warren H. May* and *James D. Clemens* for appellants.

*A. J. Murphy, Jr.,* and *F. D. Wilkins* for respondents.

508

ELLISON, J.—This is an action for $3453.66 damages for an alleged breach of a contract for the sale and delivery by defendants to plaintiffs in July, 1946, of the last two of fourteen cars of corn. The cause was tried in the circuit court of Pike county without a jury, and the judgment was for defendants. Plaintiffs appealed to the St. Louis Court of Appeals, where the judgment was affirmed. The opinion of that court is reported in 215 SW. (2d) 57. On application of the plaintiffs-appellants the cause was transferred to this court.

The contract, made in September, 1945, was for the purchase of fourteen cars of corn to be delivered two cars each month for seven months, beginning in January and ending in July, 1946, at $1.22-½ .per bushel, based on the then Omaha ceiling price, plus 1/30¢ per bushel per day for storage charges from January 1, 1946, on the last twelve cars. The defendants-respondents in turn contracted independ-

ently with a third party, the Omaha Elevator Company, to supply the corn. Shipments of the six cars for the first three months were duly made, and accepted by plaintiffs, at the contract price. Throughout the whole period of seven months the Office of Price Administration was fixing the ceiling prices on corn, and owing to the scarcity thereof, those prices prevailed generally.

In the fourth month, April, 1946, the Government raised the ceiling price 3¢ per bushel, and for May and June it was again raised 25¢. The Emergency Price Control Act of 1942 expired as of June 30, Title 50, U. S. C. A. App. §901(d), p. 194. All ceiling prices were removed; in consequence of which the price of such corn shot up to $2.35 per bushel. The appellants waived the first raise of 3¢ and accepted the two cars shipped for April. Under pressure of necessity they also accepted the four cars for May and June and paid the 25¢ raise. But when respondents early in July refused to ship the two cars of corn forthcoming that month at less than the then *market* price of $2.35 per bushel, appellants declined to accept it and later that month purchased on the open market one car at $2.10 per bushel, and another at $2.21-½ per bushel. They then brought this suit against respondents for the difference between the actual cost of the July corn thus purchased and what it would have been at the original contract price of $1.22-½ per bushel, in the sum of $3453.66.

Respondents' defenses are: (1) that the finding of the trial court in respondents' favor was based on substantial, credible evidence, and this court should defer to it; (2) that the appellants rescinded, waived, or modified the original contract sued on, and agreed to the substitution of another based on a different consideration; (3) that wartime conditions and governmental regulations frustrated performance of the original contract.

The original contract for the purchase of the corn was procured by the appellant partnership, doing business at Murfreesboro, Tennessee, through a broker named Carter at Memphis, Tennessee. He negotiated the sale contract with the respondents, who were engaged in business at Louisiana, Missouri, by long distance telephone on September 18, 1945. Thereupon he prepared a written confirmation of the contract for the whole fourteen cars, and sent copies to both appellants and respondents. Respondents contemporaneously issued their separate written confirmations for the sale of two cars of the corn for each of the seven months. Each of these bore a different contract number, as if they were separate contracts.

All of them were dated September 18, 1945, the date of the original fourteen car contract, and all showed the contract price was $1.22-½ per bushel, *based* on the then Omaha ceiling price and *including* "merchandising, elevation and brokerage charges." In other words, the Omaha ceiling price was less than $1.22-½, but when the other quoted charges were added to that ceiling, the sale price came

to that figure. The 1/30¢ per bushel per day storage charge was a separate and additional item. Except for it, and the January confirmation, which was lost but undisputed, the facts are shown in the following table:

| | Confirmation | | | Invoice and approximate time of shipment | |
|---|---|---|---|---|---|
| Contract number | Contract date | Price per bushel | Contract Delivery date | Date | Price per bu. |
| S-5055 | 9-18-'45 | $1.22-½ | Feb'y '46 | 1-17-'46 | $1.22-½ |
| S-5056 | " | " | March " | 3-30-'46 | " |
| S-5057 | " | " | April " | 5- 3-'46 | " & storage from 9-18-'45 |
| S-5058 | " | " | May " | 6-14-'46 | $1.43 plus $100 |
| S-5059 | " | " | June " | 6-29-'46 | $1.43 |
| S-5060 | " | " | July " | Not shipped | |

When the Government raised the ceiling price per bushel 3¢ in April, the Omaha Elevator Company, which was shipping the corn, did not raise the billing charge per bushel for that month above the contract price of $1.22-½, but included and concealed the 3¢ increase, as such, by dating back the separate 1/30¢ storage charge per bushel per day to September 18, 1945, the date of the contract, instead of from January 1, 1946, as the contract provided. The difference was an increase of $108, but appellants paid the attached draft on the theory that the overcharge was a mistake, and made claim therefor to respondents. The latter refunded by giving appellants credit for $100, and *respondents* wrote the Omaha Elevator Company twice, on May 15 and May 25, 1946, complaining of the overcharge and stating (in part) the following in the second letter (italics ours): "If you intend to handle the balance of the corn *differently than what the contract calls for,* wish you would please advise us of this before shipping the corn so that we may take the matter up with the parties we have sold it to, and if they do not want to agree to anything *other than the contract,* we can make different disposition."

: The Omaha Elevator Company refused to yield, and on June 7, 1946, respondents wrote appellants that the Elevator Company was "holding up shipment on the balance of your corn until they hear from you regarding this"—referring to the $100 credit. Under this coercion appellants submitted to the cancellation of the credit, and agreed to take the two April cars at the actually raised price. They were charged back with the $100 difference by the Elevator Company on June 14, as a separate item on the invoice for the next two cars, for May delivery, which had been held up as stated in respondents' letter of June 7.

In the meantime, the ceiling price of corn had been raised 25¢ per bushel by O. P. A., effective May 13, and several Government agencies had joined in requesting and recommending to grain exchanges that all futures grain contracts open on May 11 be settled at ceiling prices. The respondents and the Omaha Elevator Company refused to deliver the four cars of corn for May and June unless the appellants would pay the new ceiling price, which made the corn cost $1.43 per bushel. The appellants were grain processors, and relying on their original contract at $1.22-½ per bushel had already obligated themselves to their customers without raising their prices. But they yielded and the four cars of corn for those two months were finally shipped to appellants on or about June 14 and June 29, as shown in the above table and accepted at $1.43 per bushel.

The negotiations between the parties over that corn were conducted mainly by long distance telephone. The appellant Ellis Gray testified he made that concession separately for each of the two months of May and June, at different times, and did not bind his partnership to pay the ceiling price for the corn for the whole remaining life of the contract, that is, including the corn to be delivered in July.

The respondent Frank Sheppard testified he telephoned appellant Ellis Gray before the May corn was shipped and advised him the Government had raised the ceiling price 25¢ [to $1.43] and recommended that all futures contracts be cancelled; and that the Omaha Elevator Company would refuse to carry out the contract unless appellants would pay that price. He said Gray agreed to do it because he was so desperately in need of corn. As to the corn for June, Sheppard said he couldn't remember whether he called Gray again, or whether the May conversation covered both months, but that his "impression" was Gray agreed to take the corn at the ceiling price for the balance of the contract, or to cancel out.

Concerning the corn for July, Mr. Sheppard testified on direct examination that "we" called appellant Ellis Gray the very first days of July and offered to ship the two cars for that month. He declared he legally had the whole month to deliver it; that by the end of the month the price had dropped as low as $1.96; and that Gray never informed him he was going on the open market and buy the corn himself [although one of the two cars appellants did buy that month was purchased from respondent Sheppard's own company on July 27.]

But on cross-examination witness Frank Sheppard testified his supplier, the Omaha Elevator Company, took the position that the appellants' contract for the July shipments of corn "had already been breached" by the Government's recommendation and request of May 13 that such futures contracts be cancelled. And he expressed the personal view that the Government's *request* was a *command.* He

further admitted he told appellants he would not deliver the July corn because the Omaha Elevator Company refused to supply it at the contract price of $1.22-½ per bushel. Likewise he conceded he informed them that he would only deliver the July corn at the open market price on the day he was telephoning, which was $2.35 per bushel; and that appellants refused to take it at that price. So the corn was never delivered. But he agreed he would have shipped the July corn if appellants had been willing to stand the raise.

Frank Sheppard and his son William W. Sheppard were business associates. The latter testified that when the Government ceiling prices were raised, first 3¢ in April and then 25¢ in May, his company raised accordingly the prices on the non-delivered corn for which appellants had contracted. After the May raise, he said, "we" called appellant Ellis Gray in Tennessee and notified him of the change in price and inquired whether Gray wanted to cancel the contract, or to take the remainder of the corn at the new ceilings. He declared Gray told him to go ahead and ship it and it would be accepted at the new ceiling. The corn was received at those prices except the two cars for July.

He stated that when the Government entirely removed all ceiling prices on June 30, appellant Gray called his company [his father said "we" called Gray] the first part of July and wanted his July corn shipped promptly. [It will be remembered the June corn had not been shipped until about June 29.] The witness said he informed Gray he would have to pay for the July corn at the market price. Being informed what the price was that day, which the witness couldn't remember [his father had testified it was $2.35], Gray said it was higher than he wanted to pay, and not to ship it.

On cross-examination the son said he and his father talked to Gray the first time in May after the 25¢ raise, and that Gray told him to ship all of the balance of the contract corn—for May, June *and* July. In answer to separate questions he said: "It was understood that way." "What else could we be talking about." "We were talking about all the corn." He was asked if ▮ that was already agreed to in May, why they called Gray in June [as his father had testified] and he answered, "I don't know that we did." As to July, he said Gray called his office and wanted the corn for that month shipped immediately—on the 25¢ raise basis "he supposed." Indeed, he said "That is what we agreed to" [back in May or June]. If that were correct it would have made the July corn cost $1.43 per bushel. But he readily conceded that in the July conversation he refused to ship the corn to appellants except at the then open market price of $2.35 per bushel.

▮ So much for the underlying facts. At the conclusion of the evidence, the cause having been tried to the court without a jury, appellant requested under Sec. 114(b) of the Civil Code, Laws Mo.

1943, p. 388, Mo. R. S. A. § 847.114(b), that the trial court render an opinion—which was done. The opinion held the original contract price of $1.22-½ per bushel "based on Omaha ceiling" as stated in the six several monthly confirmations, did not mean the *then* Omaha ceiling when the fourteen car contract was made on September 18, 1945, but contemplated the Omaha ceiling *from time to time,* as the cars were shipped. On this theory the appellants would have been obligated to absorb and pay the 3¢ per bushel increase on the two cars to be shipped in April, and the 25¢ per bushel increase on the four cars to be shipped in May and June. The trial court further held that since there was no ceiling for July, the contract for that month's corn was unenforceable. The Court of Appeals opinion [215 SW. (2d) l. c. 61(3)] deferred to this ruling of the circuit court.

We do not agree. On the face of the written confirmations we hold the appellants did not contract to purchase the fourteen cars of corn at the Government ceiling prices prevailing from time to time when it was shipped. And we further hold respondents were required to ship the July corn at the contract price, although there was no ceiling price then. This matter had the attention of the parties when the contract was made. The first confirmation, issued by broker Carter, covering *all* fourteen cars, stated the price was "$1.22-½ per bushel basis *St. Louis,*" (italics ours), plus the storage charge of 1/30¢ per day per bushel from January 1, 1946, for the last twelve cars.

And when respondents issued their six confirmations (in evidence) covering the several two car monthly shipments to be made from February to July, *all* of them were dated September 18, 1945, the date of the original contract, and *all* stated the price was to be $1.22-½ per bushel, basis *track, St. Louis,* and "Price based on Omaha ceiling price and includes merchandising, elevation and brokerage charges." In other words, the cars were to be delivered on the railroad track at St. Louis, but the fixed price of $1.22-½ per bushel was to be based on the *then* Omaha ceiling and to *include* the other fixed charges specified.

Another circumstance shows this was respondents' understanding. As will be recalled, the Omaha Elevator Company included in its invoice for the April corn a concealed charge for the 3¢ ceiling raise in force that month, by dating back the storage charge to September 18, 1945, whereas the confirmation contract expressly provided that charge should not start until January 1, 1946. Respondents, themselves, thereupon wrote the Elevator Company on May 25, 1946, stating they wanted to be advised "if you intend to handle the balance of the corn *differently than what the contract calls for*" (italics ours), so that if the purchaser did not agree they could "make different disposition." This, obviously, referred to the raise in *price* and not to the mere irregularity in stating it as storage charge. For the latter fact alone would have made no substantive difference. Furthermore,

that letter was written nearly two weeks after the Government ceiling had been raised 25¢ on May 13, but it was not mentioned. Certainly, this did not evince any belief on the part of respondents at that time that they had the right to raise the price of the May and June corn accordingly.

We are also unable to agree with respondents on their second assignment, that the contract was "modified" by the parties, as regards the two cars of July corn involved here. We have in mind the [747] requirement of Sec. 114(d) of the Civil Code, Laws Mo. 1943, p. 388, Mo. R. S. A. § 847.114(d) that: "The judgment shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." But Sec. 140(c) of the same Code also provides: The appellate court shall: "give such judgment as such court ought to have given, as to the appellate court shall seem agreeable to law."

On this assignment respondents again rely on much of the evidence already discussed. It is true that appellants finally took the April corn at the 3¢ raise and the May and June corn at the 25¢ raise. The circumstances in which appellants did that are detailed above. Respondents' version is that in May appellants agreed to take the May, June and July corn at the *ceiling* price in force at the time it was to be shipped. But as already pointed out, respondents' letter to the Omaha Elevator Company of May 25 protested that the 3¢ raise violated the contract. That was their position as to that raise nearly two weeks after the government raised the ceiling 25¢ on May 13.

And the fact that appellants paid the 3¢ and 25¢ ceiling advances is not proof that they also had agreed in advance to pay the *open market* price in July after all *ceilings* had been abolished on June 30. Neither does the testimony of the respondent William Sheppard as a whole support that view. For on cross-examination he said that when appellant Ellis Gray telephoned early in July about the corn shipments for that month he (Sheppard) understood, or "supposed" Gray wanted the corn shipped on the basis of the 25¢ May ceiling [making it cost $1.43 per bushel]. And he added, "That is what we agreed to", referring to their original conversation in May. And yet respondents refused to ship the July corn for less than the market price of $2.35 per bushel. In other words, their testimony and position on that point was conflicting. If they had agreed on the $1.43 price for the July corn, they had *not* agreed on an open market price after ceilings were abolished, and there was no meeting of minds on that alleged modification. Dobbins v. City Bond & Mtg. Co., 343 Mo. 1001, 1010(2), 124 SW. (2d) 1111, 1115(3).

Another consideration in the above connection is that while the contract was single and called for the shipment of fourteen cars of corn over a period of seven months at a definitely stated price, yet it

was severable in the sense that the corn was to be shipped and paid for monthly. And the parties treated it as severable in dealing with the two price raises on the shipments in April, May and June. We have no doubt that those modifications did not obligate the appellants to make a further modification to accept the July corn at a much higher open market price. 17 C. J. S. pp. 785-790, §§ 331-335; 12 Am. Jur. pp. 870-874, §§ 315-8.

 The next, and probably the most important question in the case is whether there was a frustration of the contract by economic conditions. It was made September 18, 1945, while this country was struggling in the wake of World War II, and its economy was being administered under the Emergency Price Control Act of 1942. But while the demand for corn and other grains was heavy, both parties to this suit fully realized that, and in our opinion contracted with that fact in mind. Respondents' brief in the Court of Appeals calls attention to the fact that ''there was the heaviest demand in history for corn during the aforesaid periods''—when the contract was made and to be performed. Furthermore, respondents' sales confirmations contained, in addition to the fixed sale price, a separate storage charge of 1/30¢ per day per bushel for each of the last twelve cars of corn. And while the respondents testified this was a mere ''trade practice'', yet it enabled them or their supplier (the Omaha Elevator Company) at their option to protect themselves by purchasing the corn in anticipation of any rise in price, and storing it.

There was a Government ceiling price on corn when the contract was made, and that price was embodied in the contract. If, during the life of the contract, that ceiling price had been *lowered,* without doubt it would have prevented further performance of the contract at the original price by operation of law.[1] But in this instance the ceiling was *raised* twice and then was abolished. None of these administrative regulations forbade the sale of corn at *less* than the ceiling price. Neither can they be said to have made further performance impossible. Sheldon-Seatz, Inc. v. Coles, 319 Mich. 401, 408(5), 29 NW. (2d) 832, 835(5).

There is general authority both ways[2] on the effect of an ''unfore-

[1]Long Island Structural Steel Co. v. Schiavone-Bonomo Corp., 53 Fed. Supp. 505, 506(2), affirmed, 142 Fed. (2d) 557; Seminole Rock & Sand Co. v. Fleming, 160 Fed. (2d) 542, 544(1); Re Kramer v. Uchitelle, Inc., 288 N. Y. 467, 472, 43 NE. (2d) 493, 495(5); Sanders v. Lowenstein & Sons, Inc., 289 N. Y. 702, 45 NE. (2d) 457; Edsil Trading Corp. v. Minder & Sons, 297 N. Y. 313, 317, 79 NE. (2d) 262, 264(1). See also: Restatement ''Contracts'', § 458, p. 852.

[2]17 C. J. S., p. 952, § 463, p. 954, § 463b; 12 Am. Jur., p. 930-2, § 363, p. 935, § 366.
Restatement, Contracts, Sec. 458, p. 852: "A contractual duty or a duty to make compensation is discharged, in the absence of circumstances showing either a contrary intention or contributing fault on the part of the

seen impossibility'' as frustrating, or discharging the promisor from the performance of his contract. So far as we can find, the rule in this state announced in Ward v. Haren, 139 Mo. App. 8, 14, 119 SW. 446, has not since been departed from, that ''if a party, by his contract, charge himself with an obligation possible to be performed, he must make it good unless its performance is rendered impossible by an act of God, the law, or the other party. Unforeseen difficulties, however great, will not excuse him.'' And in Schoen v. Am. Nat'l Ins. Co., 352 Mo. 935, 951, 180 SW. (2d) 57, 59 (5-7), it was held the insurer's liability on a life and disability policy was not released because of the failure of the assured to make reports of his disability, as required by the policy, due to *impossibility* resulting from insanity. The ruling was based on the theory that the policy, properly construed, did not make such reports a condition precedent to recovery. This would imply that reservations against such impossibilities must be very clearly expressed in insurance cases, at least.

We are unable to see that any of the foregoing general citations[2] apply here. In our opinion the respondents realized when they made the contract of September 18, 1945, for the sale of the corn, that they were taking chances; and that they deliberately took them. As late as May 25 they stood by their original contract in their letter of that date to the Omaha Elevator Company about the first government raise of 3¢ per bushel.

It appears that the doctrine of frustration of contracts as applied in California contemplates not only the impossibility but also the improvidence of performance in the light of subsequent events, and that the court, as or like a court of equity, decides whether the promisor or the promisee should bear the loss in the circumstances of the particular case. Lloyd v. Murphy, 25 Cal. (2d) 48, 53-4(2), 153 Pac. (2d) 47, 50 (4, 6). But even that rule does not apply when the frustration is brought about by an act of the Government, idem, l. c. 55(5), l. c. 51(9, 10). We find nothing in the cases collected in 17 Words & Phrases (Perm. Ed.) Frustration [pocket part, p. 148-9] to warrant the application of the doctrine in this case.

There is only one other question in the case. Respondents strongly rely on the fact that when the Government raised the corn ceiling 25¢ on May 13, 1946, ''Government agencies *requested and recommended* to grain exchanges that all futures contracts open

person subject to the duty, where performance is subsequently prevented or prohibited. . . . (b) by a judicial, executive or administrative order made with due authority by a judge or other officer of the United States. . . .''

Restatement, Contracts, Sec. 288, p. 426: ''Where the assumed possibility of a desired object or effect to be attained by either party to a contract forms the basis on which both parties enter into it, and this object or effect is or surely will be frustrated, a promisor who is without fault in causing the frustration, and who is harmed thereby, is discharged from the duty of performing his promise unless a contrary intention appears.''

at the close of business on May 11 be settled at ceiling prices. It was further requested and recommended that all cash contracts be handled on a similar basis.'' (Italics ours). The quoted words appeared in the Kansas City Grain Market Review of Thursday, May 9th, 1946, which was introduced in evidence. We understand this was simply an announcement·in a trade newspaper. No Government proclamation was introduced.

But it will be noticed the article merely stated that the Government agencies had ''requested and recommended'' such action on the part of grain exchanges. It did not even purport to be a command on the part of the Government. At that time the Emergency Price Control Act, 50 U.S.C.A., App. §921(d), p. 358, provided the Administrator of the Office of Price Administration ''may, from time to time, issue such *regulations and orders* as he may deem necessary or proper in order to carry out the purposes and provisions of this Act.'' And §902, p. 327 provided: ''As used in the foregoing provisions of this subsection, the term 'regulation or order' means a regulation or order of general applicability and effect:'' We do not understand that a ''request'' or ''recommendation'' of the Government agency was more than those terms naturally imply. In other words, it was not a binding regulation or order which would invalidate appellants' contract to purchase corn below the ceiling price or to assert their ·rights under the contract after ceiling prices were abolished.

█ Under Sec. 140(c) of the Civil Code the judgment is reversed and the cause remanded with directions to the trial court to enter judgment for appellants in the sum of $3453.66, with interest as provided by law, and for their costs. All concur.

█ PER CURIAM:—The first assignment in respondents' motion for rehearing complains of error in our holding that the original, September, 1945 contract for the shipment of the corn was *not* modified so as to provide for a $1.43 price per bushel instead of $1.22-½ for the two cars of corn to be shipped in July, 1946, here involved. On that point respondents stress broker Carter's letter of July 5, 1946 to respondents. We think it does not help respondents, and set it out, with interpretative parentheses and emphasis. It said:

''On the last two cars (in June) you shipped them (appellants) he (appellants) allowed you to add 25¢ to this price ($1.22-½), and he (appellants) advises today that you want to ship them (appellants) two cars at the prevailing market today of $2.35 basis· Omaha.

''*There was nothing stipulated in your contract* (allowing the 25¢ raise) *regarding this last advance on corn,* and we believe you should go to bat with your principle (Omaha Elevator Co.) and have these last two (July) cars of corn shipped on the basis of the previous two (in June) you shipped Murfreesboro (appellants).''

These two June cars were shipped at $1.43 per bushel. And the broker's letter does show he advised respondents to try to get the Omaha Elevator Company to ship the two July cars at that same price. But that defense was not pleaded in their answer. The allegation in paragraph VII thereof was that appellants in the modified contract agreed to pay the "price placed on said corn by the government" for May, June and July—that price for July being the *market* price. And the broker Carter's letter expressly declares the latter was *not* so agreed in the modified contract.

Furthermore the respondents' testimony was equivocal and conflicting as to the terms of the modified contract. And they refused to ship the July corn at the $1.43 price, which they here contend was the modified contract price. The appellants' testimony was that the 3¢ and 25¢ modifications applied to particular monthly shipments and not to the July corn, and the whole record so indicates.

The second assignment in the motion for rehearing is that the judgment for $3453.66 was excessive, because it was based [750] alone on the difference in the market price of the two cars of corn appellants purchased on the open market in July, and the contract price of $1.22-½ per bushel, without taking into account the storage charge of 1/30 cent per day per bushel, which appellants would have had to pay in addition if respondents had delivered the July corn. The point is well taken. Respondents say it would make a difference of 7¢ per bushel. The judgment should be reduced by whatever amount the trial court finds the total storage charge on the July corn bought by appellants would have been under the contract in suit.

The third assignment contends that Ward v. Haren, 139 Mo. App. 8, 14, 119 SW. 989, referred to in the opinion, is not in harmony with two later cases cited by them: Curry v. Boeckeler Lbr. Co., 224 Mo. App. 336, 343(5), 27 SW. (2d) 473, 476(5), and Mount Vernon Car Mfg. Co. v. Hirsch Rolling Mill Co., 285 Mo. 669, 683(1), 227 SW. 67, 71(1). But in both of these cases the original contract was modified by agreement of the parties. Our citation of the Ward case was in connection with respondents' defense of *frustration* of the contract by subsequent events independent of any modification by agreement.

The motion for rehearing is overruled, and the cause is remanded with directions to the trial court to modify the judgment as indicated in the second preceding paragraph hereof.