**KANSAS CITY TERMINAL RAILWAY COMPANY, Plaintiff-Respondent,**

v.

**The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, Defendant-Appellant,**

**Chicago, Rock Island and Pacific Railroad Company, et al., Defendants-Respondents,**

**Burlington Northern Inc. et al., Defendants.**

No. KCD 26230.

Missouri Court of Appeals, Kansas City District.

March 4, 1974.

Motion for Rehearing and/or Transfer Denied May 6, 1974.

R. K. Knowlton, Chicago, Ill., Forrest P. Carson, Carson, Inglish, Monaco & Coil, Jefferson City, for appellant.

Stinson, Mag, Thomson, McEvers & Fizzell, Lawrence R. Brown, Robert L. Driscoll, Kansas City, for respondent Kansas City Terminal Railway Co.

Johnson, Lucas, Bush & Snapp, Hilary A. Bush, Kent Snapp, James L. Burgess, James M. Beck, Kansas City, for respondent Missouri Pacific Railroad Co.

James & McCanse, Thad C. McCanse, William Icenogle, Kansas City, for respondent Chicago, Rock Island and Pacific Railroad Co.

Deacy & Deacy, Edward W. Mullen, Kansas City, for respondent St. Louis-San Francisco Railway Co.

Before PRITCHARD, P. J., and SWOFFORD and SOMERVILLE, JJ.

SOMERVILLE, Judge.

This litigation took roots in the heyday of railroad passenger trains and leafed in the advent of private passenger automobiles, commercial buses and commercial airliners.

Kansas City Terminal Railway Company (hereinafter referred to as Terminal), plaintiff-respondent, and the twelve railroad defendants, one of whom is the Atchison, Topeka and Santa Fe Railway Company (hereinafter referred to as Santa Fe) and the sole appellant, are all parties to a written agreement dated June 12, 1909, and captioned "OPERATING AGREEMENT" (hereinafter referred to as agreement).

The agreement obviously sprang from a mutual desire of the parties to eliminate certain duplicitous passenger and freight train facilities and availability of services for the twelve railroad defendants in Kansas City, Missouri. Terminal, which is owned solely and equally by the twelve railroad defendants, was to and did acquire and operate, and continues to do so, certain common facilities for the use and enjoyment of the twelve railroad defendants, and provided, and continues to provide, certain special services rendered on a direct use basis to the twelve railroad defendants, as envisioned by the agreement.

The agreement, among other things, and particularly germane to the issues on appeal, contractually provides for two methods of determining the allocable share owed by each of the twelve defendants to Terminal for their right and privilege to use the common facilities provided by Terminal.

The Union Passenger Station in Kansas City, Missouri, was and is owned by Terminal and originally constituted, and continues to constitute, one of many facilities falling within the purview of the agreement. The agreement provides that all of the facilities owned and operated by Terminal are to be divided into sections and the section embracing the Union Passenger Station (referred to in the judgment entered by the trial court as Zone 6) takes on particular significance by the terms of the agreement, as well as from a standpoint of practical consideration, as will hereinafter be demonstrated.

As the result of progressive attrition of railroad passenger service and mail carried by railroad passenger trains, differences arose between Terminal and Santa Fe as

to the basis employed by Terminal in determining the allocable shares of the twelve railroad defendants for expenses incurred by Terminal with respect to mail handled at Union Passenger Station, telegraph office (located in Union Passenger Station) expense, Union Passenger Station depreciation and cost of exterior repairs, the retirement of certain non-depreciable property in the section embracing Union Passenger Station, and the retirement of certain non-depreciable property in sections other than the section embracing Union Passenger Station. These differences, during the fall of 1969, erupted into total disagreement between Terminal and Santa Fe by Santa Fe's refusal to pay the full amount of certain bills rendered to it by Terminal and by its continuing refusal to pay the full amount of certain subsequent bills rendered to it by Terminal. Terminal, on April 7, 1970, filed suit against the twelve railroad defendants for a declaratory judgment declaring the rights and obligations of the parties under the agreement insofar as they related to the differences mentioned above, and, in addition, for a money judgment against Santa Fe. A jury was waived and the suit proceeded to trial before the court. The trial court made extensive findings of fact and conclusions of law and entered the following judgment, from which Santa Fe appealed:

"WHEREFORE IT IS ORDERED, ADJUDGED AND DECREED that mail handling expenses, depreciation of Union Station, telegraph office expenses, repairs to the exterior of Union Station and retirement of non-depreciable road property are for the common benefit of

all proprietor railways within the meaning of the Operating Agreement and have been properly allocated by plaintiff in Zone 6 on the car count basis and in other zones on the car mileage basis.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that plaintiff on Count II [1] have judgment against defendant Atchison, Topeka & Santa Fe Railway Company for $407,963.92 together with interest thereon as computed through November 1, 1971, in the amount of $36,107.12 and thereafter at the rate of 7% per annum ($78.655 per day) and for its costs herein."

Certain provisions of the agreement deemed particularly applicable and pertinent to resolution of the differences that arose between Terminal and Santa Fe, which are viably involved in this litigation and to which the judgment entered by the trial court obviously addressed itself, are hereinafter mentioned for a better understanding of the legal positions taken by the parties on appeal.

Section 11 of Article III of the agreement provides that it shall in no way be altered, modified or amended absent the "consent in writing" of Terminal and each of the twelve railroad defendants. Suffice it to say, no alteration, modification or amendment of the agreement occurred [2] and, as to those provisions applicable to and determinative of the issues on appeal, they must be viewed in their primal terms.

It is of more than casual or passing importance that the only term defined in the agreement pertinent to any issue herein is

1. The reference to "Count II" is obviously a clerical error and should properly be and is corrected by deleting "Count II" and inserting in lieu thereof "Count VI", since Count VI of the first amended petition supplanted Count II of the initial petition.

2. Except, so far as the record discloses, by the First Supplemental Operating Agreement dated January 24, 1910, the provisions of which are not deemed directly involved in the appeal; it is to be further noted that the

opinion herein relates only to those sums which Santa Fe specifically placed in issue, namely, those sums which the twelve railroad defendants obligated themselves to pay under Section 6 of Article II of the agreement, and it does not relate to any other or additional sum or sums contractually agreed to by the parties to the agreement and the First Supplemental Operating Agreement; furthermore, only those portions of the agreement deemed pertinent to disposition of the appeal are, or will be, referred to in the opinion.

"Terminal Facilities". In Section 1 of Article I of the agreement, the following definition is found:

"The said Union Passenger Station and the said tracks and other facilities of the Terminal Company, and all additions, betterments, extensions and improvements thereto, and all the facilities appurtenant thereto that are now owned or may be hereafter acquired by the Terminal Company are hereinafter referred to as the 'Terminal Facilities'."

Terminal, in Section 2 of Article I of the agreement, grants to each of the twelve named railroad defendants "the right and privilege of running and operating its passenger trains, into said Union Passenger Station and of using and enjoying, for the purpose of its passenger, express and mail business, the said Union Passenger Station and its appurtenances . . . and also the right of running and operating its passenger trains, for the purposes of the passenger traffic of said Railway Company over and upon the railroad and railroad tracks of the Terminal Company . . . and of using and enjoying said railroad and tracks for the purposes of the passenger traffic of such Railway Company . . ."

Terminal, in Section 4 of Article I of the agreement, grants to each of the twelve railroad defendants "so far only as said right may be exercised without materially interfering with the passenger traffic in this contract provided for, the right and privilege, . . . of running its freight trains, . . . upon and over said Terminal Facilities, or any part thereof."

Section 10 of Article III of the agreement requires each of the twelve railroad defendants to run into Union Passenger Station all of its "passenger, mail and express trains" and imposes upon Terminal the obligation that the "passenger station facilities . . . shall at all times be adequate for the accommodation of the passenger, mail and express business

. . . " of each of the twelve railroad defendants.

Section 6 of Article II of the agreement provides the basis for determining, on a monthly basis, the amount each of the twelve railroad defendants contractually agrees to pay for the right and privilege of using the Terminal Facilities. The total amount contractually agreed to be paid by the twelve railroad defendants for the right and privilege of using the Terminal Facilities, and the allocable share thereof owed by each of the twelve individual railroad defendants, respectively, are related to the total expenses incurred by Terminal during a particular month " . . . in the operation, maintenance, renewal and repair of the Terminal Facilities (after applying to such renewal and repair any sums which may have been received on account of fire insurance), including all salaries, cost of labor, supplies, time tables, cost of fire, accident, fidelity and employer's liability insurance, insurance of employes engaged in the operation or maintenance of the Terminal Facilities; and including also all other expenses whatsoever during such month not otherwise herein expressly provided for."

Section 6 of Article II of the agreement further provides for division of Terminal Facilities, by Terminal's Board of Directors, into sections for the purpose of determining the allocable share of the total expenses, as heretofore delineated, owed by each separate railroad defendant for the right and privilege of using the Terminal Facilities. In this connection, two methods are spelled out. The first method addresses itself to that portion of the total expenses incurred by Terminal in connection with the section "embracing said Union Passenger Station and its appurtenances". This method provides that the allocable share of each of the twelve railroad defendants for that portion of the total expenses incurred by Terminal in connection with the Union Passenger Station section shall be " . . . a sum bearing the same proportion to all such expenses for such month as

the number of locomotives and cars operated by such party and arriving at or starting from the Union Passenger Station, shall bear to the total number of locomotives and cars arriving at or starting from said Union Passenger Station during such month, . . . ". This method will hereinafter be referred to as the "car count basis." The second method addresses itself to that portion of the total expense incurred by Terminal in connection with all sections other than that embracing Union Passenger Station. This second method provides that the allocable share of each of the twelve railroad defendants for that portion of the total expense incurred by Terminal in connection with all sections other than that embraced by Union Passenger Station shall be " . . . a sum bearing the same proportion to all of such expenses for such month as the mileage of locomotives and cars operated by such party within such section shall bear to the total mileage of locomotives and cars so operated during such month (including cars and locomotives handled and operated by the Terminal Company), . . . " This method will hereafter be referred to as the "mileage count basis".

Section 6 of Article III of the agreement, in part, speaks of special services to be rendered by Terminal on a direct basis to any of the twelve railroad defendants, same being apart from the right and privilege of the twelve railroad defendants to use the Terminal Facilities, and as to such specially rendered services the recipient railroad defendant contractually agrees to pay for such on a direct charge basis in addition to the amount, or amounts, determined owed on allocable basis under either or both of the two methods delineated above for the right and privilege of using the Terminal Facilities.

The following portion of Section 6, Article III, of the agreement is of paramount significance in resolving this appeal:

"It is understood and agreed that the payments to be made by the Railway Companies under Section 6 of Article II hereof *shall cover only the use and enjoyment of the Terminal Facilities and such services as are for the common benefit of the Railway Companies using the Terminal Facilities,*—such as the care of passengers in and about the train sheds and waiting rooms of said Union Passenger Station; the sale of tickets and the handling of baggage and mail thereat; the heating and lighting thereof; the maintenance and operation of tracks, switches, gates, towers, interlocking plants, etc., and generally the management, supervision, maintenance and care of all the Terminal Facilities; . . . " (Emphasis added.)

Santa Fe's postulate for appellate relief may be paraphrased as follows: the trial court's declaration of the rights and obligations of the parties under those portions of the agreement pertinent and applicable to the differences that arose between Terminal and Santa Fe, and the money judgment rendered in favor of Terminal against Santa Fe bottomed thereon, were not supported by law or fact because Terminal was required by the agreement to restrict allocation on a car count basis to only those expenses incurred by Terminal for the common benefit of the twelve railroad defendants in their use and enjoyment of Union Passenger Station. More bluntly stated, Santa Fe contends that the expenses in dispute were incurred for the common benefit of the twelve railroad defendants in their use and enjoyment of *all* the Terminal Facilities as opposed to being incurred for the common benefit of such of the twelve railroad defendants who operated passenger trains in and out of Union Station, and, axiomatically, since Santa Fe is one of a small minority of the twelve railroad defendants still operating railroad passenger trains in and out of Union Station, the end result is to subject it to bearing an unfair and disproportionate share of the expenses incurred by Terminal in operating the section embracing Union Passenger Station.

In order to meaningfully place the agreement under closer judicial scrutiny, and to accommodate an understanding of the dispute culminating in this appeal, a factual background is deemed both appropriate and necessary.

In 1909, when the agreement was executed, railroad passenger trains were the accepted and most frequently utilized public conveyance for persons and mail. Those possessed with the requisite longevity will recall that Union Passenger Station in Kansas City was once a bustling place regarding railroad passenger and mail service. However, starting at about midpoint of the twentieth century, innovations took place in the movement of persons and mail, all of which progressively took their toll in railroad passenger and mail service, and, concomitantly, the extent and nature of the use of Union Passenger Station. For example, in November of 1945 the twelve railroad defendants combined operated a total of 210 daily passenger trains in and out of Union Passenger Station; by November of 1967, the number of daily passenger trains had dropped to 66 operated by only eight of the twelve railroad defendants; and by November of 1970, the number of daily passenger trains had dropped to a low of 24, operated by only three of the twelve railroad defendants. A somewhat analogous attrition occurred with respect to mail transported by passenger trains and arriving at and being handled at Union Passenger Station. Prior to the last half of 1967, all mail handled by Terminal moved in passenger trains operated variously by the twelve railroad defendants. Sometime around October 1967, the United States Postal Service initiated a new concept for the distribution of mail, the result of which, for all practical purposes, was to shift the transportation of mail from passenger trains to freight trains and highway carriers. By 1969, as a result of the transition occurring in the movement of rail mail, the greater part of rail mail was moved in trailers or vans loaded on flatcars. The trailers or vans containing mail were unloaded from flat-

cars and then transported to and from Union Passenger Station in highway vehicles. These highway vehicles were counted as one "car" by Terminal. If a freight car carrying mail entered the section embracing Union Passenger Station, the freight car containing mail was counted by Terminal. By 1970 freight mail constituted 88% of the total of all mail transported by the twelve railroad defendants in and out of Kansas City. The facilities provided and operated by Terminal for handling mail are located in the section embracing Union Passenger Station.

In November, 1968, Terminal began handling non-rail mail directly for the United States Postal Service pursuant to a contract authorized by Terminal's Board of Directors. Since Terminal is jointly owned by the twelve railroad defendants, any profits flowing from the contract inure proportionately to the benefit of all twelve of the railroad defendants, and, conversely, any losses are reflected proportionately among the twelve railroad defendants. Terminal's contract with the United States Postal Service was not in evidence, hence the record is silent as to the basis of or the amount charged by Terminal for the handling of non-rail mail.

Terminal bills each of the twelve railroad defendants on a direct charge basis, as a specially rendered service, for the loading and unloading of mail transported by them whether in railroad cars, vehicles or vans. This direct charge for loading and unloading mail for the twelve railroad defendants is calculated on the number of linear feet of mail (a quantity measure of mail established by the United States Postal Service) handled and such charge, during the period from June, 1970, through March, 1971, averaged 76¢ per linear foot. During the same period Terminal's expenses for other mail handling service (sortation, distribution, etc.) averaged $2.30 per linear foot. These "other mail handling expenses" constituted a portion of Terminal's expenses reflected in its billing practices in determining the allocable share

owed monthly by the various twelve railroad defendants for the right and privilege of using the Terminal Facilities and were allocated on the car count basis, since they were expenses incurred by Terminal in the operation and management of the section embracing Union Passenger Station. The end result of doing so was to subject Santa Fe to a disproportionately high share of "other mail handling expenses" incurred by Terminal, since it was one of but three of the twelve railroad defendants still operating passenger trains in and out of Union Passenger Station.

Terminal's telegraph office is located in the Union Passenger Station. Its function is to send and receive telegraphic communications for all twelve railroad defendants. A survey conducted in September of 1970 disclosed that of a total of 1750 messages, 1176 were for the freight or other business of the twelve railroad defendants, while only 574 messages related to railroad passenger traffic. Terminal does not apportion depreciation of the Union Passenger Station between the section embracing Union Passenger Station and the remaining sections comprising the Terminal Facilities. Telegraph office expense, Union Passenger Station depreciation and cost of exterior repairs and expenses for the retirement of non-depreciable property in the section embracing Union Passenger Station, likewise, constitute portions of Terminal's expenses reflected in its billing practices in determining the allocable share owed monthly by the respective twelve railroad defendants for use of the Terminal Facilities and are calculated on a car count basis.

Portions of Union Passenger Station are occupied by Terminal for its general offices in operating and managing all of the Terminal Facilities. Additional portions of Union Passenger Station are rented to other persons or entities and rentals therefrom inure proportionately to the benefit of all twelve railroad defendants.

Santa Fe contends: (1) The agreement "as a whole clearly indicates a mutual intent" of the twelve railroad defendants "to separate terminal services between their passenger and freight train activities and to regard mail traffic as an incident of passenger service."; (2) The word "mail" as used in Section 6 of Article III of the agreement connotes only mail transported in passenger trains; and (3) Therefore, Section 6 of Article III restricts the allocation of mail handling expenses on a car count basis to only that portion of such expense as may be shown to have been incurred in conjunction with the handling of mail transported by passenger trains. Santa Fe's contention regarding the other disputed expenses may be described as following the same general thrust although they are, at best, somewhat opaque.

Santa Fe seeks to support these contentions by broadly asserting that those portions of the agreement deemed pertinent, are ambiguous and of doubtful meaning, and, therefore, subject to judicial construction. The crescendo of their assertion peaks in the heretofore quoted portion of Section 6 of Article III of the agreement— Santa Fe's contention that the "common benefit" restriction contained in Section 6 of Article III of the agreement proscribes Terminal from allocating, on a car count basis, any expenses incurred by it in the operation of the section embracing Union Passenger Station that are not restricted to the "common benefit" of such of the twelve railroad defendants who operate passenger trains in and out of Union Passenger Station.

Santa Fe builds to the peak of the crescendo by arguing, (1) historically, when the agreement was executed mail was carried by passenger trains, (2) Sections 2 and 4 of Article I and Section 10 of Article III of the agreement disclose a mutual intent on the part of Terminal and the twelve railroad defendants to separate passenger and freight train services and activities and to regard mail as an incident of passenger train service, and (3) therefore, "mail" as used in the heretofore quoted portion of Section 6 of Article III of the

agreement restricts allocation on a car count basis to such portion of "other mail handling expenses" incurred by Terminal in operating the section embracing Union Passenger Station, as is attributable to mail transported solely by passenger trains. Broadly, and as heretofore mentioned somewhat opaquely at best, Santa Fe argues that Section 6 of Article III of the agreement restricts allocation on a car count basis to such portion of the other disputed expenses incurred by Terminal in operating the section embracing Union Passenger Station as is attributable solely to passenger train utilization as distinguished from non-passenger train utilization.

■ Santa Fe's argument is patently fallacious. Santa Fe assumes, sub silentio, that the agreement is so ambiguous or clouded as to defy a clear understanding of its meaning. All authorities cited by Santa Fe spring from the assumption that the agreement is subject to judicial construction. The agreement here is not ambiguous. One of the most hallowed principles of contract law is that perspicuous contracts must be enforced as written and courts are not permitted to engage in interpolation under the guise of construction, because there is nothing to construe. State ex rel. National Life Ins. Co. v. Allen, 301 Mo. 631, 256 S.W. 737 (1923); State ex rel. Prudential Ins. Co. of America v. Bland, 353 Mo. 956, 185 S.W.2d 654 (1945); and Cross v. Ladue Supply, Inc., 424 S.W.2d 108 (Mo.App.1967). Tangentially, equally venerated is the long standing principle of contract law that unforeseen difficulty or hardship will not free a party from performing his contractual obligations so long as performance is not rendered impossible by "an Act of God, the law or the other party", none of which is the case here. Ellis Gray Milling Co. v. Sheppard, 359 Mo. 505, 222 S.W.2d 742 (banc 1949); Stein v. Bruce, 366 S.W.2d 732 (Mo.App.1963); and MFA Mutual Ins. Co. v. Farmers & Merchants Ins. Co., 443 S.W.2d 220 (Mo.App.1969).

■ Viewed in a historical context, the parties to the agreement at its inception quite likely envisioned that most, if not all, of the mail handled at the Union Passenger Station would, into perpetuity, arrive and depart via railroad passenger trains. The montage painted by Santa Fe's argument is one of understandable frustration brought about by the near demise of railroad passenger service. Be that as it may, Santa Fe's lack of prescience at the time it executed the agreement does not render the agreement ambiguous and subject to construction. The car count and mileage count bases of determining the allocable share of each railroad defendant of the total expenses incurred by Terminal, same constituting the basis for determining the amount owed by each railroad defendant for its right and privilege of using the Terminal Facilities, can only be characterized as arbitrary methods for the purpose of simplifying computation of the allocable share owed by each railroad defendant. Nevertheless, the provisions of the agreement providing for them are not ambiguous. Additionally, they were contractually agreed to, and were, and continued to be, binding upon Sante Fe in spite of the fortuitous change of conditions occurring in the movement of people occasioned by the challenge of passenger automobiles, commercial buses and commercial airliners. The only restriction placed on Terminal respecting reimbursement from the twelve railroad defendants for the right and privilege of using the Terminal Facilities, regardless of whether allocation thereof is made on a car count basis or a mileage count basis, is whether the expenses chargeable to the twelve railroad defendants for the right and privilege of using the Terminal Facilities, as clearly and unequivocally spelled out in Section 6 of Article III of the agreement, " . . . are for the common benefit of the Railway Companies using the *Terminal Facilities* . . . " (Emphasis added.) Bear in mind, Section 1 of Article I of the agreement defines "Terminal Facilities" as being all inclusive—all of Terminal's Facil-

ities, including, but not limited to, Union Passenger Station.

 Section 6 of Article III of the agreement goes on to contractually exemplify certain chargeable expenses which are "for the common benefit of the Railway Companies using the Terminal Facilities . . . " as including, among numerous others, the handling of mail at Union Passenger Station. The restriction contained in Section 6 of Article III of the agreement does not, as contended by Santa Fe, dichotomize chargeable expenses into those inuring separately to the "common benefit" of such of the twelve railroad defendants running passenger trains in and out of the section embracing Union Passenger Station, and those inuring separately to the "common benefit" of such of the twelve railroad defendants who do not run passenger trains in and out of the section embracing Union Passenger Station. To the contrary, Section 6 of Article III of the agreement is unambiguous, and the clear and unequivocal language employed discloses that the "common benefit" restriction imposed upon chargeable expenses, whether allocated on a car count or mileage count basis, is met if the chargeable expenses relate to operation and management of *all* the Terminal Facilities which all twelve railroad defendants are granted the right and privilege of using. Expenses incurred by Terminal, and allocated by it on a car count basis, for the handling of mail at Union Passenger Station, as well as the other expenses questioned by Santa Fe, inure to the common benefit of all twelve railroads regarding their right and privilege of using the Terminal Facilities.

Having determined that the agreement is clear and unequivocal regarding the issues on appeal, and therefore not subject to judicial construction, and to be enforced as written, the judgment entered by the trial court is consonant with both the facts and the law and must be affirmed (as amended —see footnote 1). Consequently, appellate treatment of the additional points assigned by Santa Fe—that Santa Fe had not acquiesced in the manner Terminal treated the questioned expenses and therefore no basis in fact existed to support the trial court's conclusion of law that the protracted interpretation of the agreement by the parties supported the judgment, and that Santa Fe was not estopped from asserting that the questioned expenses were improperly allocated—would constitute nothing more than an exercise in prolix dictum.

Judgment affirmed as amended.

All concur.