512 F.Supp. 135 (1981)
Barbara M. DEIBEL, Plaintiff,
v.
Robert F. DEIBEL, Jr., Defendant.
No. 79-876 C (1).
United States District Court, E. D. Missouri, E. D.
March 30, 1981.
John Shapleigh and Barry Short, St. Louis, Mo., for plaintiff.
Charles Seigel and Jay L. Levitch, St. Louis, Mo., for defendant.

*136 MEMORANDUM
WANGELIN, Chief Judge.
This matter is before the Court for a decision on the merits following a bench trial. Plaintiff brings this suit alleging a breach of contract and intentional infliction of emotional distress, and defendant counterclaims for malicious prosecution of a separate state cause.
After consideration of the testimony adduced at trial, the exhibits introduced into evidence, the briefs of the parties, and the applicable law, the Court hereby makes and enters the following findings of fact and conclusions of law. Any finding of fact equally applicable as a conclusion of law is hereby adopted as such and, conversely, any conclusion of law applicable as a finding of fact is adopted as such.

Findings of Fact
1. Plaintiff, Barbara M. Deibel, is a resident of the State of Pennsylvania.
2. Defendant, Robert F. Deibel, Jr., is a resident of the State of Missouri.
3. The amount in controversy herein, exclusive of interest and costs, is in excess of Ten Thousand Dollars ($10,000).
4. Plaintiff and defendant were married on July 30, 1940, and divorced pursuant to Decree of the Circuit Court of St. Louis County, Missouri on September 17, 1968.
5. On September 10, 1968, prior to the entry of the divorce decree, plaintiff and defendant entered into an agreement which set forth child custody provisions, marital property division, and various alimony provisions. There were eleven portions of the agreement, relevant to the subject matter of this suit, which concerned contract clauses dealing with basically three elements of alimony assessment: (1) the monthly amounts which defendant agreed to pay plaintiff; (2) the nature and extent of medical and health coverage insurance which defendant agreed to provide for plaintiff; and (3) an agreement that the monthly alimony sum would be annually adjusted in accordance with the fluctuation of the cost of living as measured by the Cost of Living Index calculated by the United States Department of Labor. The specific, relevant sub-parts read as follows:
3. Second party [defendant] agrees to pay to first party [plaintiff], as and for alimony, the sum of Thirteen Hundred Dollars ($1,300.00) per month, payable on the first day of the month following the decree of divorce, it being understood that said alimony shall terminate upon the remarriage or demise of the first party.
4. Second party agrees to obtain and pay for major medical policy which policy is to provide for first party medical and health coverage of a quality not less than that in effect at Dixie Mills Company at the time of the execution of this agreement. This coverage may be purchased through Blue Cross and Blue Shield or by a major medical policy with some accredited insurance company and is to be continued in force by second party until the death or remarriage of the first party. Should first party be uninsurable then in such event second party shall be relieved of all liability in connection therewith.
* * * * * *
8. The parties recognize that the cost of living as published by the Department of Labor of the U.S. Government may increase or decrease from time to time over the years, and the parties agree that the above-mentioned alimony in the sum of Thirteen Hundred Dollars ($1,300.00) per month shall be increased or decreased as provided herein in the same percentage as the above-mentioned cost of living may increase or decrease. Said change, if any, shall be made annually when the complete calendar year figures are made available by the Department of Labor, and said change shall be adjusted and made effective for the entire subsequent calendar year. In other words, in the event that the cost of living increases five per cent (5%) during any one year, then, in such event, second party shall increase his payments to first party during the subsequent year by the sum of five per *137 cent (5%). In any year when the cost of living decreases, then, in such event, second party may decrease his payments to first party during the subsequent year, but in no event shall his payments be decreased below the sum of $1,300.00 per month. For the purpose of determining increase or decrease during all subsequent years, the cost of the living index number as of the date of divorce shall be the base for all future calculations. All adjustments shall be based upon the published index closest to the 21st day of December of each year following the divorce.
6. From the day of the divorce in September of 1968 through 1974 the defendant paid the monthly alimony amount as consented to in the agreement signed prior to the divorce in 1968, together with periodic, yearly increases in accordance with the Cost of Living Index and references to its applicability in the divorce agreement. During the calendar year 1975, difficulties arose with defendant's business, the Dixie Mills Company. Defendant communicated to plaintiff the existence of the financial difficulties confronting his business, and the parties began to negotiate for a modification or stay of the continued increased alimony payments linked to the Cost of Living Index.
7. During 1975, both parties communicated with each other in an attempt to agree whether the Cost of Living Index increases should be terminated, or whether the collection of the money accrued should merely be held in abeyance until such further time as the parties agreed upon. In a letter of July 10, 1975 addressed to the defendant, an attorney for the plaintiff set forth the concessions that the plaintiff, Barbara Deibel, was willing to make. The details of the letter appear to be quite clear. Mrs. Deibel agreed to a one year moratorium on the collection of the additional amounts of alimony owed. Although entitled to One Thousand Nine Hundred and Twenty Two Dollars and Seventy Cents ($1,922.70) per month beginning with the calendar year 1975, according to the 1968 base alimony amount of One Thousand Three Hundred Dollars ($1,300.00) per month to which is added the Cost of Living Index increase through 1974, plaintiff agreed to postpone collection of this additional amount. As further detailed in the letter from plaintiff's attorney, Mrs. Deibel agreed to accept monthly checks of One Thousand Seven Hundred Seventy Three Dollars ($1,773.00) for the period from January 1, 1975 until December 31, 1975, postponing collecting the remaining amounts owed to her for this year because of the economic considerations set forth in communication from defendant Robert Deibel. The letter also clearly states that in no way was the proposal to postpone collection of the amounts owed under the divorce agreement to be interpreted as in any way waiving the obligation of Mr. Deibel to forward these monies owed, nor was this an attempt to modify the terms of the divorce agreement for subsequent years.
8. Beginning in January of 1975 for a period running through June of 1979, defendant paid plaintiff One Thousand Seven Hundred Thirteen Dollars ($1,713.00) per month. From July, 1979 through July, 1980 defendant forwarded to plaintiff One Thousand Dollars ($1,000) per month.
9. According to the terms of paragraph 4 of the divorce agreement, defendant consented to obtain and pay for a medical and health insurance coverage for plaintiff as long as she was insurable. On January 25, 1973, defendant wrote to plaintiff to advise her that he believed her to be uninsurable and that he was relieved of the obligation to obtain insurance coverage for plaintiff according to the terms in paragraph 4 of the agreement. However, a letter dated January 24, 1973 from Mr. Ronald Krebs, employed by Standard Underwriters, Inc., to Mr. Robert Deibel states that although plaintiff had a history of alcoholism, and was therefore a substandard risk, insurance coverage was available albeit at a significantly increased premium.
10. Plaintiff obtained health and medical coverage with Philadelphia Blue Cross/Blue Shield commencing in September *138 of 1973. These Blue Cross/Blue Shield premiums amounted to Two Thousand Eight Hundred and Fifteen Dollars and Twenty Eight Cents ($2,815.28) for the period 1973 to 1980. Plaintiff also obtained major medical coverage from Provident Life & Accident Insurance Company during this time at One Hundred Twenty Two Dollars ($122.00) per year. From 1973 to 1980, plaintiff paid an aggregate of Three Thousand Seven Hundred Ninety One Dollars and Twenty Eight Cents ($3,791.28) for health and medical coverage comparable to that which was to be provided to plaintiff under the terms of the divorce agreement.
11. The United States Department of Labor's Cost of Living Index historical table sets forth the following pertinent data. Assigning the base figure of one hundred as a unit of measurement before the year 1968, the Cost of Living Index for the years from 1968 through 1979 may be computed and assigned the following values:

Month and Year CLI Per Cent Increase
 Over September, 1968
 (105.1)
December, 1974 155.4 47.9%
December, 1975 166.3 58.2%
December, 1976 174.3 65.8%
December, 1977 186.1 77.0%
December, 1978 202.9 93.0%
December, 1979 230.0 118.8%

12. Based upon the figures supplied by the United States Department of Labor an adjustment of the base rate of Thirteen Hundred Dollars ($1,300.00) indicates that for the year 1975 One Thousand Nine Hundred and Twenty Two Dollars ($1,922.00) per month was owed; for the year 1976 Two Thousand Fifty Seven Dollars ($2,057.00) per month was owed; for the year 1977 Two Thousand One Hundred and Fifty Six Dollars ($2,156.00) was owed per month; for the year 1978 Two Thousand Three Hundred and Two Dollars ($2,302.00) per month was owed; for the year 1979 Two Thousand Five Hundred and Nine Dollars ($2,509.00) per month was owed; and for the year 1980 Two Thousand Eight Hundred and Forty Four Dollars ($2,844.00) per month was owed.
13. A listing of the monies paid by defendant together with the monies owed according to the terms of the divorce agreement may be illustrated as follows:

Year Amount Amount Total Arrearage
 Due Paid For Year
1975 $1,922[*] $1,713 $2,508[*]
1976 $2,057 $1,713 $4,128
1977 $2,156 $1,713 $5,316
1978 $2,302 $1,713 $7,068
1979 (Jan.-June) $2,509 $1,713 $4,776
1979 (July-Dec.) $2,509 $1,000 $9,054
1980 (Jan.-July) $2,844 $1,000 $12,908
 _______
 TOTAL ALIMONY ARREARAGES 1975-1980 $50,758

14. Referring to the total yearly amount in arrearage and calculating the simple interest rate at 6% per annum prior to September 1, 1979 and 9% simple interest per annum on amounts owed after September 1, 1979, the sum of Five Thousand Ninety Dollars and Eighty Five Cents ($5,090.85) is the proper amount of interest on the amounts due by defendant under the terms of the divorce agreement.
15. On January 4, 1979, plaintiff filed a motion to hold defendant in contempt of court and to recover attorney's fees against defendant in the Circuit Court of St. Louis County, Missouri in an attempt to have defendant cited for contempt and jailed for his alleged failure to pay alimony and medical and health insurance premiums owed to plaintiff under the terms of the divorce agreement. Plaintiff dismissed the contempt proceeding without prejudice on May 24, 1979.

Conclusions of Law
This Court has jurisdiction over the parties herein and has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. And, because the forum for this cause is Missouri, this Court will apply Missouri law to resolve all legal controversies. McNally v. Pulitzer Publishing Co., 532 F.2d 69, 78 (8th Cir. 1976).
Count 1 of this cause is simply a suit for breach of contract, i.e., the agreement signed by the parties immediately prior to the dissolution of their marriage in September of 1968. In his defense, defendant raises a variety of claims, none of which the Court finds persuasive.
There is no evidence to support defendant's claim that a modification of the contract *139 was agreed upon, or affected by the conduct of the plaintiff. Although it is clear from the record that defendant did suffer financial hardship beginning some time in the early 70's, such difficulties do not in and of themselves modify the divorce agreement. Letters exchanged between both plaintiff and defendant point out the desire of the defendant to reduce his alimony payment, but there is no evidence that the plaintiff consented to any such modification. A letter dated July 10, 1975 underscores the agreement by the plaintiff to temporarily suspend her demand for the defendant to tie his monthly alimony payment to the Cost of Living Index figures for the calendar year 1974. However, it is clear from the terms of the letter that this "modification" was not intended to permanently suspend the duty of the defendant to continue to adjust the base alimony monthly payment according to the Cost of Living Index. Nor was the temporary suspension of the defendant's duty to adjust the base alimony monthly payment to conform to the CLI to be a waiver of the plaintiff's right to later collect the deficit amounts.
In addition, there is no factual basis to support a finding that performance of this contract met the conditions of impossibility. Once a party binds himself to the terms of a contract and the other party performs all conditions and promises which bind the party to its performance, a defendant's insolvency or inability to tender the money owed does not constitute defense of impossibility of performance. See Howard v. Nicholson, 556 S.W.2d 477, 481 (Mo.App. 1977).
Testimony in this case by defendant certainly would lead to a conclusion that defendant had suffered, and may continue to suffer, business setbacks and financial woes which were not contemplated when the original divorce agreement was signed in late 1968. However, performance of the contract may only be excused/rendered impossible by an Act of God, by the law, or by the other party. Kansas City Terminal Railroad Co. v. Atchinson, 512 S.W.2d 415 (Mo.App.1974). Financial difficulties arising to frustrate the ability of the defendant to meet his financial obligations owed under the terms of the agreement do not in themselves suspend or release him from his contractual duties. Stein v. Bruce, 366 S.W.2d 732 (Mo.App.1963). No such fact pattern necessary to justify a defense of impossibility presents itself here.
With respect to defendant's claim that he was released from all obligations to insure plaintiff because the plaintiff was an uninsurable risk, evidence presented at the trial leads this Court to a different conclusion. The letter from Mr. Krebs to defendant, dated January 24, 1973, clearly sets forth that coverage on plaintiff could be obtained, although at a significantly increased premium. The Court does not believe that the increased risk which plaintiff presented after her bout with alcoholism could cause one to fairly characterize her condition as uninsurable.
With respect to Count 2  the plaintiff claims that defendant's breach of the agreement was a tortious intentional infliction of emotional distress  the Court finds that the plaintiff's evidence wholly fails to substantiate any such contention. Testimony adduced at trial, as well as letters between the parties entered into evidence, shows that defendant's financial condition during the 1970's was marked by ever increasing regression from the financial status enjoyed in 1968. One element recognized by Missouri courts as constituting the tort allegedly inflicted here is that the defendant's action must be "so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Liberty Loan Corp. of Antioch v. Brown, 493 S.W.2d 664, 667 (Mo.App.1973), quoting Restatement (2d) of Torts, § 46 (1964). The breach of contract which the Court has earlier found defendant to be liable under can in no way be characterized as outrageous conduct. The financial woes of the defendant are clearly documented in the record before this Court, and appear to be the sole motivation of defendant's failure to *140 meet his contractual obligations. In addition, letters from defendant to plaintiff show that defendant was aware of his contractual responsibility. Defendant felt compelled to frequently explain the reasons for his failure to meet his contractual obligations. Thus, the Court finds no merit to plaintiff's contention that defendant's breach of contract rose to the level of intentional infliction of emotional distress.
Defendant counterclaimed that plaintiff was guilty of malicious prosecution. As the facts earlier set forth detailed, plaintiff instituted contempt proceedings against defendant in Circuit Court in St. Louis after the failure of the defendant to tender full monthly alimony payments. Testimony by plaintiff reveals that she was following the advice of her counsel and pursued this contempt action because it was unclear from the terms of the divorce decree whether or not the agreement signed prior to the court's divorce judgment was decretal or contractual in nature. If the terms of the agreement are found to be decretal in nature then the Court which entered such decree has continuing jurisdiction over the parties. Since the alimony provision would be found to be a judgment of the court, failure to abide by the judgment would be considered grounds for contempt of court. However, if the agreement in the instant case would be interpreted as merely contractual in nature, then the court which entered the divorce would have no jurisdiction over the parties, and could not hold the defendant liable for violation of the agreement in the absence of a judgment that a breach of contract was realized. See generally Kirk v. Kirk, 598 S.W.2d 153 (Mo. App.1980).
In the instant cause, questions as to whether the divorce agreement was contractual or decretal in nature could have been legitimately entertained by plaintiff and her counsel. Nothing in the record before this Court indicates that the contempt action filed by plaintiff was terminated in favor of defendant  a necessary prerequisite for a successful claim. McFarland v. Union Finance Company, 471 S.W.2d 497, 499 (Mo.App.1971). See also, Stix & Co., Inc. v. First Mo. Bank & Trust Co. of Creve Coeur, 564 S.W.2d 67, 70 (Mo. App.1978). Therefore, defendant has failed to prove all the elements of the cause of action in his counterclaim for malicious prosecution.
Accordingly, judgment on Count 1 will be entered in favor of plaintiff. Defendant shall pay alimony in arrearage in the sum of Fifty Thousand Seven Hundred Fifty Eight Dollars ($50,758.00), together with interest totaling Five Thousand Ninety Dollars and Eighty Five Cents ($5,090.85), and the sum of Three Thousand Seven Hundred Ninety One Dollars and Twenty Eight Cents ($3,791.28) to compensate for the plaintiff's medical and health insurance expenditures. Judgment on Count 2 will be entered in favor of defendant; and judgment on the counterclaim will be entered in favor of plaintiff.
NOTES
[*] $1,763 per month due in 1975; balance ($209.00) payable thereafter by terms of July 10, 1975 letter.