Anthony **NOLA** and Elizabeth J. **Nola**, Appellants,

v.

**MEROLLIS CHEVROLET KANSAS CITY, INC., et al., Respondents.**

**No. KCD 26995.**

Missouri Court of Appeals, Kansas City District.

May 3, 1976.

Motion for Rehearing and/or Transfer Denied June 1, 1976.

See also, Mo.App., 537 S.W.2d 636.

William J. Hill, Kansas City, for appellants.

W. H. Bates, Daniel M. Dibble, Kansas City, for respondents.

Before DIXON, P. J., PRITCHARD, C. J., and WASSERSTROM, J.

WASSERSTROM, Judge.

Plaintiff Anthony Nola sues his former employer Merollis Chevrolet Kansas City, Inc., and other defendants who control that corporation, in four counts: (1) Count I is against Merollis Chevrolet Kansas City for breach of employment contract; (2) Count II is against defendants Carl B. Merollis and Edward N. Harris for inducing Merollis Chevrolet Kansas City to breach that contract; (3) Count III is against Carl and Harris for breach of "buy-out" contracts between those two defendants respectively and Nola; and (4) Count IV proceeds against those three defendants together with defendant Merollis Chevrolet, Inc., for alleged fraud and conspiracy to oppress Nola. Merollis Chevrolet, Inc., pressed a counterclaim on a promissory note signed by plaintiffs. From judgment in favor of plaintiff Anthony Nola on Counts I and III but against him on Counts II and IV and against both plaintiffs on the counterclaim, plaintiffs appeal.

Nola was a long time employee of the Merollis family in automobile agencies operated by the latter in Detroit and later in St. Louis. In 1969 Carl determined to expand his St. Louis operation, conducted as Merollis Chevrolet, Inc., and he entered into negotiations to acquire the Jerry Green Chevrolet Agency in Kansas City. Since the Chevrolet Motor Division of General Motors Corporation would consider this as a chain operation, Carl knew that they would require that the Kansas City operation have a different "dealer-operator" before a Chev-

rolet franchise would be granted. Furthermore, Chevrolet policy required that this dealer-operator have an immediate 25% stock interest and that he have the right to acquire the balance of the stock ownership within a period of five years.

About the time that Carl was negotiating with the owners of the Jerry Green agency, he also entered into discussions with Nola (who was then general manager of the Merollis St. Louis agency) to become the dealer-operator in Kansas City, and Carl also began discussing with Harris arrangements under which the latter would participate in the financing of a corporation to carry on the new Kansas City operation.

The contemplated capitalization of the new agency was to be $200,000, so that Nola's 25% equity participation would come to $50,000. He was able to raise cash of only $6,500, including payment to him of a $5,000 bonus by Merollis Chevrolet, Inc., which normally would not have been paid until the end of the year. In order to make up the balance, Carl arranged for the Bank of St. Louis to lend Nola $35,000, to be secured by Nola's stock in the new agency and by Carl's agreement to guarantee payment; and the balance of $8,500 was provided by loan to Nola by Harris. Pursuant to these arrangements, 25% of the stock in Merollis Chevrolet Kansas City was issued to Nola. Harris and Carl each provided half of the remaining capital, and 37½% of the capital stock was issued to each. The 37½% originally issued to Carl was subsequently reissued to Merollis Chevrolet, Inc., since Carl had caused that corporation, which was solely owned by him, to pay the subscription price.

As prerequisite to and part of the closing transactions with Chevrolet, Carl and Harris each executed a "buy-out" agreement with Nola (designated as the buyer) which provided:

"IT IS UNDERSTOOD AND AGREED that the buyer shall have the opportunity to increase his investment in the dealership from salary, bonus and/or dividends he receives from the dealership so that by making equal annual purchases representing Twenty percent (20%) of the stock held by the seller, he may acquire seller's complete ownership within a period of Five (5) years.

"IT IS UNDERSTOOD AND AGREED that the buyer will receive a salary of $25,000 per year and a bonus of 10.0% of net profit before bonus and income tax but after an amount equal to 10% return on the seller's total investment. Buyer agrees to use all funds less taxes from bonus and dividends to purchase additional stock from seller but not to exceed Fifteen (15%) of the seller's equity in dealership's net worth for any given year.

\* \* \* \* \* \*

"IT IS UNDERSTOOD AND AGREED between the parties hereto that the value and the consideration for the purchase of additional capital stock in this proposed dealership shall be determined and not exceed the current net worth of the business on December 31st of the year of said option.

"IT IS UNDERSTOOD AND AGREED between the parties that the buyer shall have the right to acquire any of seller's financial interest which remains outstanding at the conclusion of the Five (5) year term from any source of capital available to him providing that it involves a financial reorganization acceptable to Chevrolet Motor Division."

As part of the same closing, the new corporation Merollis Chevrolet Kansas City executed a Dealer Selling Agreement with Chevrolet which provided in part as follows:

"THIRD: This Agreement is a personal service contract, and is entered into by Chevrolet with Dealer in reliance upon and in consideration of the personal qualifications, and the representations made to Chevrolet with respect thereto, of the following named person or persons who, it is agreed, will substantially participate in the ownership of Dealer and/or will actively participate in the operation of Dealer's Chevrolet dealership:"

Immediately following in the blanks provided, the name of Nola was shown as partici-

pating both in ownership and in operation and that of Carl as participating in ownership. Then after some intervening language, paragraph THIRD concludes with the following provision:

"No change in such ownership, financial interests or active management of Dealer shall be made without the prior written approval of Chevrolet. Any such approved change shall be evidenced by the execution of a revised 'Dealer Statement of Ownership, Financial Interests and Active Management'."

Nola immediately moved to Kansas City, and the new agency business commenced on August 1, 1969. The business at once encountered major trouble. All of Kansas City was gripped in a major construction strike with attendant adverse financial consequences, particularly in the working class area in which the new Merollis agency was located. In addition, the automobile salesmen and repair mechanics had embarked on a strike, the striking salesmen established picket lines at the Merollis agency, and the strike continued steadily through January, 1970. The financial report of the agency showed substantial loss. These reports went both to Carl in St. Louis and to William H. McGuire, the Chevrolet Zone Manager in Kansas City. Both of them were concerned by the loss figures and began discussions with Nola as to ways in which to reduce expenses. Carl particularly was critical of the high level of expenses and also with respect to various practices carried on or condoned by Nola. These complaints eventuated in a joint meeting of stockholders and directors of Merollis Chevrolet Kansas City on November 22, 1969, during the course of which Carl warned on behalf of himself and Harris that costs would have to be cut and that if Nola did not comply with this and previous admonitions to the same effect, then "the corporation would have to take prompt action to change management." Carl further stated that he and Harris were unwilling to make any additional investment in the corporation "unless real management improvement was demonstrated by Mr. Nola."

Instead of the situation improving, the net loss escalated in December so that the loss for that month alone was $28,787.07. Upon receipt of those figures, Carl had a meeting separately with Harris and then came to Kansas City for a meeting with Nola on January 27, 1970. This meeting was treated by all concerned as a joint meeting of stockholders and directors, although no formal advance notice was given to Nola. At this meeting Carl announced to Nola that the business could not continue without further advances and that he and Harris were unwilling to put any more money into the agency with Nola in charge. Carl then offered on behalf of himself and Harris to either buy out Nola or to permit Nola to buy out their interests. Nola stated that he himself did not have adequate funds with which to make such a purchase, but that he would like some time to explore the possibility of raising the money. Carl agreed to the granting of time for this purpose, but he proceeded with the determination already made by him and Harris to replace Nola as the managing head of the business. A new manager brought in from St. Louis immediately took over for this purpose. Although Nola reported daily to the place of business for some weeks thereafter, he was not permitted to perform any management functions.

After Nola was so terminated, he continued to retain and use an automobile which had been supplied to him by the corporation as a fringe benefit. On April 10, 1970, Merollis Chevrolet Kansas City brought a replevin action to recover possession of that automobile. In response, Nola filed a counterclaim and a third party petition against Carl and Harris; and in reaction to that, Merollis Chevrolet Kansas City amended its original petition to allege mismanagement and waste by Nola as dealer-operator. During that same month of April, 1970, in which the replevin action was commenced, the Bank of St. Louis called upon Carl to pick up the Nola note which was then in default, and Carl caused Merollis Chevrolet, Inc., to pay the amount due in full to the Bank of St. Louis. Thereupon Merollis Chevrolet, Inc., on August 28, 1970, filed

suit against Nola and his wife for the balance due, unpaid interest and attorneys fee. To this second suit Nola again filed a counterclaim and a third party petition. Later, on May 25, 1971, Merollis Chevrolet, Inc., foreclosed on the stock securing the $35,000 note and purchased that stock at the foreclosure sale for $22,000. Before trial both of the suits were consolidated, the parties were realigned, and the case proceeded to trial on an amended petition in four counts on the part of Nola and a counterclaim by Merollis Chevrolet, Inc. on Nolas' $35,000 note.

At the close of the evidence, the court sustained the defendants' motion for directed verdict as to Counts II and IV of Nola's petition, and it also sustained the motion by Merollis Chevrolet, Inc., for a directed verdict on its counterclaim for which judgment was entered against Nolas in the amount of $16,260. Counts I and III of the Nola petition were submitted to the jury which returned a verdict in favor of Anthony Nola for $35,000.

Nolas' points on appeal, greatly summarized, are as follows: (1) that the trial court should have granted an additur to the jury verdict; (2) that alternatively the trial court should have granted a new trial on the issue of damages only; (3) that the trial court should not have directed a verdict on Counts II and IV; and (4) that the trial court should not have directed a verdict on the counterclaim.

## I.

Plaintiffs' first and second points on appeal are so closely related that they can be treated together. In both, plaintiffs raise the same basic issue as to whether Nola was entitled to damages in excess of the $35,000 awarded by the jury. The only difference between the two points is that in the first plaintiffs suggest that this should have been done by the court itself in the form of additur, whereas in the second they say that if the additur device be not accepted,[1]

then the trial court should have granted a new trial so that a larger measure of damages could be submitted for jury determination.

Regardless of that difference in mechanics to accomplish its purpose, plaintiffs' underlying argument is that the jury found under the instructions that Nola had fully performed his duties for Merollis Chevrolet Kansas City, that under the evidence he had a five year contract for $25,000 per year, plus fringe benefits, and that the amount due him for the five year employment period is mathematically calculable to the sum certain of $143,380; and they further contend that the amount due even calculated pro rata to the date of the verdict would come to $118,542. Thus they say that the verdict actually rendered by the jury in the amount of $35,000 is contrary to the evidence and unsupportable.

Defendants counter that the verdict is justified on the ground that it represents compensation to Nola for the last one-half of what was only a one year employment contract, together with a return of his cash investment and an amount equal to the deficiency judgment which was directed against plaintiffs under the counterclaim. Plaintiffs in effect admit that defendants are right if Nola's employment was in fact for only one year rather than for five years. In this respect they say in their brief: "Under such a theory [of a one year employment contract], it might well be argued that the verdict was composed of $12,000.00 as remaining salary for one year, the $6,500.00 lost investment and the $16,222.00 [sic] judgment which the court directed against Plaintiff [sic] on the $35,000.00 note and about which the jury was told (T. 808–809), making a total of $34,722.00, or within $278.00 of the actual verdict." The whole argument between the parties on this phase of the case therefore comes down to the basic issue of whether Nola's employment was for one year or for five years.[2]

1. With respect to the permissibility of additur, see *Stahlheber v. American Cyanamid Co.*, 451 S.W.2d 48 (Mo.1970) and *Worley v. Tucker Nevils, Inc.*, 503 S.W.2d 417 (Mo. banc 1974).

2. Although not suggested by either party, other

The duration of Nola's employment by Merollis Chevrolet Kansas City is essentially a question of fact dependent on the intention of the parties as determined by all of the circumstances. 53 Am.Jur.2d Master and Servant § 27, p. 103; 56 C.J.S. Master and Servant § 8, p. 74. There is one element in this situation which tends to support an inference that the parties intended a five year period of employment. This element consists of the factor that the buy-out agreements gave Nola five years within which to acquire all of the stock owned by Carl and Harris. This factor might possibly have been sufficient to warrant an express submission to the jury of this as a factual question.

However, plaintiffs never made any request for any such submission. Their whole theory in the trial court was and continues to be in this court that the employment contract was one for five years as a matter of law. Even now, they make no point on this appeal that there was any error in instruction in failing to expressly submit for jury determination whether the employment was for one year or for five years. In view of this line of strategy which has been consistently followed by plaintiffs, the only matter now presented is whether this record shows as a matter of law that Nola had a five year contract. No such showing has been made.

Not only does the record here not compel the conclusion of a five year employment contract, but to the contrary the far more reasonable interpretation is that the parties intended only a one year employment period. A number of factors combine to support this interpretation. First of all, the contemplated salary arrangement referred to in the buy-out agreements is expressed in terms of "$25,000 per year." While the

statement of salary in accordance with a one year unit does not compel the conclusion that the parties intended a one year contract, nevertheless that factor together with other factors, may be taken to indicate an agreement for that time unit. Restatement, Agency 2d § 442(b), p. 339. In addition, the buy-out agreements provided for annual bonuses to Nola in the amount of 10% of net profit. Provision for such an annual bonus or share of profits at the end of the year has frequently been relied upon for a holding that the hiring was for a one year period. 11 A.L.R. 469, 479; 100 A.L.R. 838; 161 A.L.R. 706. Still other factors aim in the direction of a one year contract: Nola left a managerial position in St. Louis and moved his family to Kansas City; and the position which he assumed in Kansas City was an important one in which an intention for temporary employment was not likely. These factors are to be given consideration in the present inquiry. Restatement, Agency 2d § 442(b), p. 339. Also to be considered is the fact that Nola's election as president was for a term of one year. And still further, a one year initial period ties in with business realities in the automobile industry, in which that period represents a fair standard for testing the effectiveness of the management of a new retail sales agency. In this regard, the Chevrolet Zone Manager testified that it would take a one year experience to test the efficiency of the business operation, and this one year test was adopted by plaintiffs' attorney himself as "a good yardstick" in the course of his closing argument to the jury. Even the options for stock purchase by Nola are limited to a maximum amount in any given year, so that his purchase could not "exceed Fifteen (15%) of the seller's equity in dealership's net worth for any given year." In view of all these factors, it

conceivable possibilities are: 1) that the contract was for employment at will; or 2) that the employment was for a reasonable length of time. The analysis, infra, of all the circumstances in this case demonstrates that the first of those interpretations would be inappropriate; the same factors which go to support the conclusion that the parties intended a contract for a one year period of employment, apply

likewise to negate an intention that the employment be at will for an indefinite period. The second of those interpretations would not change the result reached in this opinion; if it could be said that the parties intended the employment to be for a reasonable time, then the factors mentioned show that the reasonable period would be one year.

can by no means be said that the jury was unreasonable in calculating damages based upon an employment for a one year period.

Plaintiffs lay heavy stress on the provision in the Dealer Selling Agreement which provided that there would be no change in the management of Merollis Chevrolet Kansas City "without the prior written approval of Chevrolet." Plaintiffs point out that defendants concede that there never was any written approval by Chevrolet of Nola's termination and removal from management. They go on to argue that this approval was a condition precedent, noncompliance with which made the termination illegal and ineffective.

■ The weak link upon which that argument pulls apart is that Nola has no right to rely upon or seek to enforce the provisions of the Dealer Selling Agreement. That agreement was between Chevrolet and Merollis Chevrolet Kansas City, with the dealer's covenants running solely to Chevrolet. Plaintiffs seek to bridge this gap by saying that Nola was a third party beneficiary of this agreement. That contention cannot be accepted for the reason that Nola was at most an incidental rather than a direct beneficiary. The authorities are uniform in holding that a mere incidental beneficiary is entitled to no rights under the contract to which he is not a party. *Mertens v. MGR Incorporated*, 507 S.W.2d 433 (Mo.App.1974); *Stephens v. Great Southern Savings & Loan Ass'n*, 421 S.W.2d 332 (Mo.App.1967); *Black and White Cabs of St. Louis, Inc. v. Smith*, 370 S.W.2d 669 (Mo.App.1963). The facts of this case fall within that rule. Chevrolet had its own purposes to serve by the dealership agreement, including the provision now in question. It is to be presumed that the provision was intended by Chevrolet for its own benefit, not that of Nola. 17 Am.Jur.2d Contracts § 304, l.c. 730.

It is quite true that Chevrolet did intend to make Nola the direct beneficiary of certain promises relating to a certain amount of salary, annual bonuses, and a right to acquire all of the equity interest in the agency within a five year period. How-

ever, with respect to these matters as to which Chevrolet wanted to give Nola a direct interest, it followed the direct and unequivocal method of requiring that the other principals in the new Merollis agency contract direct with Nola, pursuant to written contracts to which Nola had to be a party, and Chevrolet would not grant its franchise unless and until those direct contracts with Nola were made and submitted to Chevrolet for approval. It must be inferred from this course of dealing that everything that Chevrolet intended to be for the direct benefit of Nola was required by it to be included in the contracts to be made directly by Carl and Harris with Nola. Since those contracts to which Nola was a direct part contained no provision conditioning the right of Merollis Chevrolet Kansas City to terminate Nola's employment, it must be concluded that Chevrolet did not intend for Nola to have any enforceable right in this regard. The contractual provision in the Dealer Selling Agreement requiring Chevrolet's agreement to a change in management, if for Nola's benefit at all which is very doubtful, provided benefit to him merely incidentally. That this must be true is virtually demonstrated by the fact that Chevrolet could agree to a termination of Nola's employment regardless of whether Nola was willing to be terminated and indeed even if it was against his vehement protest.

■ Still further, the record strongly indicates a waiver by Chevrolet of the provision in question. The record shows that a Chevrolet Zone Manager generally keeps in close touch with a new agency and that the Zone Manager in Kansas City did so particularly with respect to the new Merollis agency in view of the fact that it was losing money from September through January. Zone Manager McGuire testified that during that period he called four or five times upon Nola to discuss the agency's business problems. While McGuire (who was the Kansas City Zone Manager until January, 1970) changed his job in that month and the new Zone Manager did not testify in this case, nevertheless it would be incredible to

believe that the new Zone Manager did not continue to call upon the Merollis agency just as McGuire had done prior to January, 1970. Any call or inquiry by the manager after January 27, 1970, would immediately disclose that Nola had been severed from management functions. That simply must have been known to Chevrolet through its Zone Manager. As a matter of fact, this is not left wholly to conjecture since Carl testified directly that he did give oral notification of this management change to Chevrolet. In view of the more than three years which expired between Nola's termination and the date of trial (May 21, 1973), it must be inferred that Chevrolet knew of the change of management and waived the requirement of its written consent and execution of a new Dealer Selling Agreement.

Summarizing, plaintiffs' contention that damages are mathematically calculated in excess of the jury verdict, based on a five year employment contract, is untenable.

## II.

Plaintiffs' third point on appeal contends that Anthony Nola was entitled to go to the jury on the theory of tortious interference with Nola's employment contract (based on Count II of the petition) and upon conspiracy to oppress Nola economically (based on Count IV of the petition). Neither of these contentions is well taken.

■ With reference to the theory that defendants Carl and Harris are liable for inducing a breach of contract, recovery is barred by the legal principle that one interested as a stockholder or officer in a corporation is privileged to so induce the corporation, provided that no improper means are used, the defendant acts in good faith to protect the corporation and does not act for his own personal benefit. This remains true even though the defendant in so acting may have been guilty of an error of judgment. 45 Am.Jur.2d Interference, § 54, p. 327; 26 A.L.R.2d 1227, l.c. 1270; 3 Fletcher Cyc. Corps. § 1001, p. 540; Avins, "Liability for Inducing a Corporation to Breach Its Contract," 43 Cornell L.Q. 55 (1957); *May v. Santa Fe Trail Transportation Co.*, 189 Kan. 419, 370 P.2d 390 (1962); *Wilson v. McClenny*, 262 N.C. 121, 136 S.E.2d 569 (1964); *Worrick v. Flora*, 133 Ill.App.2d 755, 272 N.E.2d 708 (1971); *Rhine v. Sanders*, 100 Ga.App. 68, 110 S.E.2d 128 (1959).

■ Nor do plaintiffs stand in any better stead with respect to their contention that the defendants engaged in a conspiracy to oppress Nola economically. A careful review of the whole record fails to show any evidence fairly supporting this charge. The termination of Nola in January of 1970 was done in what appears to have been a good faith exercise of business judgment.[3] Even though the jury did not agree that Nola's termination was in fact justified, still that merely makes out a breach of contract and does not go so far as to support the charge of conspiracy to oppress. The litigation which followed was complicated, hard fought and perhaps to an extent embittered, but no more so than frequently occurs as a common incident to forensic struggle in the courts. Nola himself admitted in his testimony that Carl (who was the moving spirit among the defendants) had treated him fairly in general in the twenty-two years of their relationship and had never done him any serious wrong, although "there were times when we had our problems and disagreements as two normal people would." He further admitted that Carl

3. Defendants offered considerable evidence tending to show mismanagement by Nola, including maintaining an excessive parts inventory, retaining an excessive number of demonstrators with equipment which was too expensive, allowing the service manager a percentage commission on "internal labor," permitting accounts receivable to become too high, allowing preparation charges for preparing new cars to become greatly in excess of industry practice, permitting the sale of clothing and jewelry in the store, keeping too many low value trade-in cars on the used car lot instead of wholesaling them, expending too much to recondition used cars, improper processing of reports respecting internal repairs on used cars, expenditure of funds for lavish and unnecessary equipment on pick-up trucks used for parts pick up and delivery, retaining an excessive number of personnel, and failure to process warranty paperwork timely and in proper form so as to recover reimbursement from Chevrolet.

had truly wanted him to succeed in the Kansas City agency and that nobody from Merollis Chevrolet had done anything to prevent him from getting a job since January, 1970.

The trial court committed no error in directing a verdict for defendants on Counts II and IV.

## III.

Plaintiffs argue that judgment should not have been directed on the counterclaim because: (1) the foreclosure on the stock to secure the note was not conducted in a commercially reasonable manner as required by § 400.9–504(3) RSMo 1969; and (2) that the acts of the defendants rendered payment of the note impossible or frustrated the purpose thereof. Neither of these contentions can be sustained.

With respect to compliance with the statutory mandate, the manner of foreclosure appears to have been entirely reasonable. Due notice on the proposed sale was published and also mailed to plaintiffs. On the date of which notice was so given, a public auction took place, conducted by defendants' attorney. Defendant Merollis Chevrolet, Inc., made the best and only offer in the amount of the book value of the stock. No challenge to the amount so bid is made by plaintiffs and indeed the amount bid seems quite favorable to them inasmuch as the stock in question represented only a minority interest in Merollis Chevrolet Kansas City. It could hardly be expected that an outsider would be willing to pay the book value, but instead would undoubtedly have exacted a substantial discount below book value.

Plaintiffs place much stress on the fact that the sale took place in St. Louis, Missouri, whereas the business of the corporation was located in Kansas City. No significance is seen in this fact, when consideration is given to the facts that the note was pledged in St. Louis and the corporate headquarters of Merollis Chevrolet, Inc.,

was located in St. Louis. Plaintiffs cite no authority even remotely indicating that the circumstances mentioned tend to make the foreclosure sale commercially unreasonable.

As for the claim that defendants prevented payment of the note, the facts lend no support. Nola may have intended to pay the note out of salary and bonus to be earned from Merollis Chevrolet Kansas City, and of course he had no such earnings after January, 1970. However, he could and the record shows that he did work elsewhere. The note could have been paid from those earnings. Accordingly it cannot be said that defendants prevented payment of installments on the $35,000 note as they came due.

With respect to plaintiffs' argument based on commercial frustration, plaintiffs admit in their brief that "[r]esearch reveals that the doctrine has not yet been applied in Missouri." [4] Even under the law of states which have accepted that doctrine, no case has been cited nor found applying the doctrine under facts at all similar to those of the case at bar.

In any event, no prejudice has been caused to plaintiffs by reason of the judgment against them under the counterclaim, since they have already recouped the full amount as part of the jury verdict in their favor. In the course of closing argument, defendants' attorney called the jury's attention to the fact that the court had ruled that Merollis Chevrolet, Inc., was entitled to recover $16,260 on plaintiffs' note. Defendants' counsel then went on in effect to make an offer of judgment as follows:

" . . . if you members of the jury feel you want to do anything at all for Tony Nola—I don't propose to tell you what to do—you give him sixteen thousand two hundred sixty dollars, just that sum. That will just wash out that note, that is fine, we won't collect a dime on it, just give him sixteen thousand two hundred sixty dollars, we break even, every-

---

4. For some discussion of this doctrine, see *Ellis Gray Milling Co. v. Sheppard*, 359 Mo. 505, 222 S.W.2d 742, 748 (Mo. banc 1949).

body goes their own way. I respectfully suggest and request that you do just that."

The jury did bring in a verdict for $35,000 which was, of course, in excess of the amount for which defendants' counsel had asked them to enter judgment in favor of Anthony Nola. That the $35,000 did include the $16,260 is virtually conceded by plaintiffs in their brief where they say that the $35,000 judgment might well be argued to consist of various items, including "the $16,222.00 [sic] judgment which the court directed against Plaintiff [sic] on the $35,-000.00 note." Thus, what plaintiffs lost by judgment under the counterclaim, they immediately got back by way of the $35,000 judgment in favor of Anthony Nola.

### IV.

In view of the affirmance of the judgment below, it becomes unnecessary to rule on defendants' motion to dismiss this appeal.

All concur.