Terry & JoAnn GREEN, Respondents,

v.

The BEAGLE–CHILCUTT PAINTING CO., INC., & Shirley Beagle, Appellants.

No. WD 38066.

Missouri Court of Appeals, Western District.

Jan. 13, 1987.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 3, 1987.

Application to Transfer Denied April 14, 1987.

Elwood L. Thomas and Sandra R. Stigall, of Shook, Hardy & Bacon, Kansas City, for appellants.

Timothy H. Bosler, Stephen W. Nichols & Thomas C. Capps, Liberty, for respondents.

Before SHANGLER, P.J., and MANFORD and BERREY, JJ.

MANFORD, Judge.

This is a civil action seeking damages for breach of contract and for tortious interference with a contract. The judgment is reversed and the cause remanded.

Appellants present seven points of error which, in summary, charge the trial court erred (1) in submitting respondents' claim for tortious interference with contract against individual appellant, Shirley Beagle, because appellant Beagle was the party acting on behalf of the corporate appellant under a contract of employment and, therefore, individual appellant Beagle could not also, based upon the same conduct, be guilty of tortious interference with contract; (2) in submitting the verdict-directing instruction on tortious interference with contract against individual appellant; (3) in submitting respondents' claim for tortious interference with contract against individual appellant, Shirley Beagle, because the evidence did not establish that individual appellant acted without justification; (4) in submitting the verdict-directing instruction against corporate appellant Beagle-Chilcutt on the issue of breach of contract; (5) in admitting certain expert testimony on the issue of lost profits; (6) in submitting the issue of punitive damages against individual appellant Beagle because there was no evidence to support the giving of a punitive damage instruction; and (7) in submitting the punitive damage instruction because said instruction was an erroneous deviation from MAI.

Before setting forth the factual account of this litigation, it is perhaps in order to identify the parties and further, to affix a designation to each for clarification within this opinion. Appellants are individual appellant, Shirley Beagle (hereinafter re-

ferred to as Beagle), an original defendant at trial, and corporate appellant Beagle-Chilcutt Painting Co., Inc., (hereinafter referred to as the Corporation) also an original defendant at trial. Respondents are Terry Green and JoAnn Green, individuals, but also husband and wife (hereinafter referred to by their respective names) who were original plaintiffs at trial.

The following is a summary of the pertinent facts. Any additional facts deemed applicable are set forth in further detail in the disposition of this appeal, *infra.*

The record discloses that the Corporation was originated and was operated as a painting company from 1949 through 1963. In 1967, Beagle and his former spouse, started a business named Beagle's Rental Center. By and through incorporation, Beagle's Rental Center was owned by the Corporation, and Beagle and his former spouse were the majority shareholders of the Corporation. In October, 1969, Terry Green and JoAnn Green opened the Eazy Rental Company located in Liberty, Missouri. Beagle and Terry Green met in October, 1969. While each of them operated rental companies, they were friendly toward one another. In 1976, Terry Green opened Lawn and Leisure of Clay County, Inc., which, in essence, was a take-over of a John Deere distributorship in Liberty, Missouri. Terry Green operated Eazy Rental Company and Lawn and Leisure at the same location. It should be noted that the Beagles' operation was some seven miles from the Green operation and located within Kansas City North, Missouri.

Due to the common nature of their businesses and through a trade association, contact between Terry Green and Beagle increased. In 1979, Beagle approached Terry Green about the latter's becoming manager of the Corporation. Terry Green declined. In February, 1982, the two commenced discussion of the possible merger of their two rental businesses. This discussion included the possibility of a buy-out over a period of time by Terry Green, and led to Green's working part time for the Corporation. In May, 1982, Terry Green became the general manager of Beagle's

Rental Center. On August 10, 1983, Terry Green and Beagle executed documents which caused (1) employment of Terry Green with the Corporation; (2) the merger of Eazy and Lawn and Leisure into the Corporation; and (3) the establishment of stock options in Terry Green whereby over a period of time he could purchase additional stock in the Corporation. While these documents were executed on August 10, 1983, there is no dispute between the parties that they ratified the date of June 1, 1983 as the effective date thereof.

In general, the agreement reached between Terry Green and the Corporation was as follows: Terry Green transferred Eazy and Lawn and Leisure to the Corporation. In return, 159.61 shares of common stock of the Corporation were transferred to Eazy and 45.04 shares of common stock of the Corporation were transferred to Lawn and Leisure. There was a stock purchase agreement executed by Shirley Beagle, Lindley Beagle (his former spouse), and Terry and JoAnn Green. This agreement reflected ownership of 205 shares of common stock of the Corporation in Terry and JoAnn Green. Pursuant to the stock purchase agreement, Terry and JoAnn Green held the option to purchase (annually for a period of five years) 69 additional shares (each year) of the common stock of the Corporation. The effective date of the option was June 1, 1985. The stock purchase agreement also provided that if Terry Green was involuntarily terminated from his employment with the Corporation, it was required that all the shares of common stock then owned by Terry and JoAnn Green be sold back to the Corporation and all future option to purchase was ended.

In addition to the stock purchase agreement, there was executed an employment contract which carried the same effective date of June 1, 1983. The term of employment was five years. This contract bore the terms of Terry Green's salary ($19,500.00 per annum (gross), payable at $375.00 per week). It also noted Terry Green as the employee and Beagle-Chilcutt Corporation as the employer. Green's employment was as vice-president/secretary of the Corporation, provided he was elected

to those positions by a favorable vote of the Corporation's board of directors. His duties were prescribed as those of general manager pursuant to a corporate organizational chart. It is not desirable, for purposes herein, to set forth the employment contract verbatim because of the length thereof, plus the inclusion of many terms not necessarily important to the issues on this appeal. As to any specific term directly applicable to any issue herein, that term or those terms will be set forth verbatim *infra.*

Terry Green's testimony was that on December 15, 1983, Beagle announced to him that he (Beagle) and his wife were getting a divorce. Terry Green further testified that Beagle first criticized his (Green's) job performance by way of a "written review" on December 30, 1983. Beagle testified that the two had a meeting in November of 1983 concerning Green's "lack of leadership" and "assumption of responsibility." The following language was contained in the "written review":

1. Several weeks back as you recall I asked you when you were going to assume your physical role on these premises and make this office your operational headquarters. I was disturbed that I had to ask you to do that.

The controversy regarding the above-quoted matter centered upon Beagle's contention that Terry Green was spending too much time at the Eazy-Lawn Leisure location and not enough at Beagle's Rental. Terry Green testified that Beagle had never mentioned this matter to him, and that further he was, in fact, spending a majority of his time at the Beagle Rental Center. Terry Green testified that he asked Beagle to explain his complaints but that Beagle refused. The same communication of December 30, 1983 included the additional language:

2. On at least five separate occasions I have asked you to define your duties. More specifically I have been concerned with the actual work you intend to perform. You have yet to give me any sort of answer.

3. Do you think you could step into Mikes job and be effective.

a. Do you think you know the rudiments of how this place runs on a day to day basis and if not when do you think you will. Again to be specific when do you intend to learn to do the job yourself.

b. Are you aware that you are evading certain basic responsibilities and asking or letting Mike do your job for you.

4. Do you spend your time effectively?

a. Why do you go to Liberty each day at noon and spend a minimum of 2½ hours or more.

b. There is no justification for you to relieve the employees at noon hour or for you to go home for lunch.

c. Does it have any bearing on our operations now or in the future when the employees wonder how you spend your time or wonder what you are supposed to do here.

5. Do you feel that employees' opinions of what you do or contribute is important?

6. Do you realize that most employees in this store would rather not deal with you.

7. Do you think you are capable of being a 'Chief' but at the same time function as an 'Indian'?

#### Shirley

Terry Green further testified that he eventually prepared a written job description and submitted the same to Beagle. In addition, Terry Green stated that he told Beagle that he (Green) had no doubt in his own mind that he could handle, and in fact had handled, the day-to-day operation of the business. Green also stated he advised Beagle that he was at the "Liberty store" to relieve the only "counter person" for lunch and to go home himself for lunch. He stated that the counter personnel at the "Vivion store" (Beagle Rental) were always relieved for lunch. It was Green's testimony that Beagle knew prior to the merger that he (Green) always went home for lunch. Green stated that he confronted

Beagle for specifics about Beagle's criticisms, but Beagle offered no explanation. It should be noted that the above "written review" was executed by Beagle in his capacity as president of the Corporation. This is not disputed between the parties.

Terry Green continued his testimony and stated that shortly after Beagle advised him of his pending divorce, he and Beagle had a discussion about the matter. Terry Green was asked by counsel and responded as follows:

Q. Did you and Mr. Beagle have any other meetings concerning—Well, excuse me. Around this period of time, did Mr. Beagle indicate to you about how the property was going to be divided between him and his wife who he was in the process of divorcing?

A. Sometime in the period after he had come in and announced that he had walked out on Lindley, and they were going to get a divorce. I was concerned, of course, about what effect, if any, it would have on the business. He indicated to me that what his plan was was to let Lindley have the building and land at Vivion Road, and that he would take the home that they had been living in here in the Liberty area. He also indicated to me that he would have to do something about the $5200 a month rent that was presently being paid to himself, at this point in time, because he couldn't afford to give that much to her.

Q. It was actually being paid to him and her?

A. Him and her, yes.

Q. At that point in time?

A. Yes, Sir.

Q. But, the way you understood under this plan who would end up owning the land?

A. Lindley would end up owning the building and land on the Vivion Road location. Shirley would end up with their house here on the outskirts of Liberty.

Q. Did you have then, at that point, any further meetings in December, or shortly after December, concerning your job performance?

A. No, Sir, we did not have any meetings concerning my job performance until in April.

While on this appeal, both in the statement of facts and in argument, Terry Green asserts: "Beagle told Terry Green that he wanted Terry Green out of the business by June 30, 1984". The record reflects the following:

Q. Did you have any discussions about you continuing to be employed there or the ability of the business to support you?

A. Well, in a meeting, one of the meetings that we had, in April, I think it was the third meeting that we had April 14th, Shirley indicated to me that the business had not been doing as well as he had expected, and he did not feel like the business could support the both of us.

Then, Terry Green was asked about a meeting between him and Beagle on April 14, 1984, and Terry Green responded:

A. Shirley indicated to me he wanted me out of the business. That he felt like the stock of the business would be back up to what it had been at the time we mergered by June 30th, and, therefore, he wanted me out of the business by June 30th.

Q. What was your response?

A. Needless to say, I was shocked. I really didn't have much of a response at that time.

On April 24, 1984, Beagle tendered to Terry Green the following letter:

April 24, 1984

Terry Green
1438 Hemlock
Liberty, Missouri 64068

Re: Employment Agreement-Terry Green, Employee-The Beagle Chilcutt Painting Co.-Employer

Dear Mr. Green:

As president of The Beagle Chilcutt Painting Company, I am hereby giving you written notice of material defaults under the Employment Agreement between yourself and The Beagle Chilcutt Painting Company, executed affective (sic) June 1, 1983. In accordance with

Section 12 of the Agreement, you are hereby notified that you are in material violation of the Agreement in the following respects:

1. You have been assigned responsibility for handling the purchase, sale and associated accounting involved in the company's "Lawn and Leisure of Clay County" operations. During the ten months you have been responsible for that operation, you have consistently provided inaccurate accounting information as to the company's liabilities and assets for that operation. You are also following improper accounting methods with respect to equipment received on trade-ins. You should meet with the undersigned, president of the corporation, to develop new accounting procedures and to discuss a definite program for elimination of inaccurate accounting reports.

2. Your management methods are passive in nature, and consequently you fail to recognize and take curative action to solve problems. Consequently, in several instances where the undersigned, as president, has notified you that certain employees were either unhappy or incompetent, you failed to take curative action to find and train replacements and the employees quit without notice and without an opportunity for the company to train replacements. You must make a reasonable effort to know and understand the jobs that are to be performed by the various people that you are responsible to manage.

3. You do not effectively use your time in performing your responsibilities but in fact waste substantial amounts of time in travelling between stores, between suppliers and in other unproductive activities. You should meet with the undersigned promptly to discuss methods for improving the effective use of your time.

4. In accordance with your instructions, you prepared a purchase order procedure for the company, but have failed to follow your own procedure.

5. You have not made a reasonable effort to attempt to learn to use the company's computers or to understand them. You should immediately commence a concerted effort to learn to utilize the computers and to understand them.

6. You have permitted your son to take a company owned 12″ color television set with him to college. At the time of this letter, the television set is still in his possession. You are aware that the company policy strictly prohibits free usage to your son. You are directed to create a rental agreement covering the usage through the current date and immediately make payment for such use.

The matters discussed above and other matters have been discussed with you from time to time and yet you have failed to cure these defaults or to make substantial progress toward curing them. Consequently, you are hereby notified that if you do not cure the defaults specified above within ten days from the receipt of this letter, a notice of termination will be issued.

Sincerely,

THE CHILCUTT PAINTING CO., INC.

By /s/ Shirley Beagle
Shirley Beagle, President

SB:lg

The two met on April 26 and 27, 1984 to discuss the April 24th letter. Terry Green testified as to the discussions held in these two meetings. On May 5, 1984, Terry Green was given written notice alleging "material defaults" under the employment agreement and that he (Green) had been given ten days to correct the "defaults", and upon his failure to correct the same he was terminated at 10:00 a.m. on May 10, 1984. The termination notice was executed by Beagle in his capacity as president of the Corporation.

Terry Green testified that on May 10, 1984, he and Beagle sat down and tried to "work through the John Deere accounting system". This was a point raised in the Beagle letter of April 24, 1984 above (item no. 1). Green stated that Beagle told him, "I had no idea it was as complicated as this. You should have a full time account-

ant up here to make entries on the John Deere to keep track of it." Terry Green then testified in response to all the other factors described in the Beagle letter of April 24, 1984, and called as an expert one Robert Bolin to establish Green's damages.

Beagle testified in response to Green's claims. At the close of the evidence, the trial court entered a directed verdict for the Greens in the sum of $81,967.20, plus interest on their claim for monies due for their common shares of stock. This directed verdict is not challenged on this appeal.

The issues of breach of contract and tortious interference were submitted to the jury. The jury returned its verdict in favor of the Greens on their claim of breach of contract for $250,000.00. The jury also returned its verdict against Beagle as an individual defendant on the Greens' claim of tortious interference with contract for the sum of $250,000.00 in actual damages and $100,000.00 in punitive damages. This appeal followed the overruling of timely-filed post-trial motions.

It is readily observable that appellants' points (1), (2), (3), (6), and (7) directly pertain to the portion of the judgment entered for the Greens on their claim for tortious interference with contract against individual appellant Beagle. These varied points can be and are hereby combined and summarized as follows: Beagle claims error against the trial court in the submission of the claim of tortious interference with the contract because Beagle could not be liable for both breach of contract and tortious interference based upon the same facts. He also claims that the evidence was insufficient to establish that he acted without justification, there was no evidence to support any award for punitive damages, and these errors were compounded by the submission of erroneous instructions.

Reduced to its simplest form, appellants' challenge is that there was insufficient evidence to warrant the submission of respondents' claim for damages for tortious interference with contract. Appellants expend an inordinate amount of time and effort arguing that since Beagle at all times acted in his capacity as president of the Corpora-

tion, he could not be liable for tortious interference with contract. They contend that if such not be the rule of law, then anytime a corporation (which must act through its agents) breaches a contract, then its agents and representatives are liable for tortious interference with contract. The law on this particular question is quite settled. If a corporate agent, employee, or representative induces the breach of a contract and such action is based upon bad faith, improper means, or for their direct personal (as opposed to corporate) benefit, then said agent, employee or representative can be held liable for tortious interference with contract. *Nola v. Merollis Chevrolet Kansas City, Inc.*, 537 S.W.2d 627, 634 (Mo.App.1976); *Stanfield v. National Electrical Contractors Association, Inc.*, 588 S.W.2d 199, 202 (Mo.App.1979); and *Eib v. Federal Reserve Bank of Kansas City*, 633 S.W.2d 432, 436 (Mo.App.1982).

 Since appellants challenge the sufficiency of the evidence as to the submission of the Greens' claim for tortious interference with contract, this court must review the evidence relative to the requisite elements comprising the tort of interference with contracts. The requisite elements have been declared to be:

(a) a contract or valid business relationship or expectancy;

(b) knowledge by the defendant of the contract or relationship;

(c) intentional interference by the defendant which induces the breach of contract or relationship; and

(d) the absence of justification; and

(e) resulting damages. *Francisco v. Kansas City Star Co.*, 629 S.W.2d 524, 529 (Mo.App.1981).

It is obvious from the evidence herein that elements (a) and (b) above are present and are not in dispute. The question is whether the Greens' evidence was sufficient to satisfy elements (c), (d), and (e).

The Greens have theorized that they entered into the relationship with Beagle and the Corporation on the basis that Terry Green would be the acting general manager, and that over a period of five years, the

Greens would purchase sufficient shares of stock so as to gain ownership/control of the Corporation. Green theorized that this relationship was also based on Beagle's plan to slowly withdraw from the business and retire. The Greens asserted that when Beagle decided to divorce his former wife, this caused Beagle to suffer financial losses, and that with such losses, Beagle then changed his plan intending to remain with the Corporation and to oust Terry Green from the business.

The evidence which the Greens claim supports this theory is as follows: In December, 1983, Beagle announced to Terry Green his intention to divorce his spouse, Lindley. He acknowledged to Green that he would lose his residence and $5,200.00 per month rental on the building lease (the Beagle Rental Co. building). Some few months later, Beagle began dating an employee of Beagle Rental and they subsequently married. In April, 1984, Beagle is said to have declared to Green his (Beagle's) intention to get rid of Lindley (his former wife), get rid of Terry (Green), and get his house back. From this, Green concludes that since Beagle was getting a divorce and losing the land, building, and monthly income from the lease, plus having to provide for a new wife, that his (Beagle's) plans changed from one of eventual retirement from the business to one of determined effort to get rid of him (Terry Green).

The foregoing is not the whole of evidence developed during the Greens' case in chief. The evidence also disclosed the business lost money after Green became employed, and Green admitted that he had been told this fact. In addition, Beagle had asked for a job description from Terry Green and Green's response was that he did not deem it as important as his other duties and did not get around to it. There was evidence that Green's son was making private use of a television which, according to Beagle, was against company policy. This use was terminated after Terry Green was questioned about the matter. Beagle also raised questions about the use of a line of credit at a local service station and questioned Terry Green about Green's son using this credit line. There was evidence concerning Beagle's request about a certain employee he fired and Green's handling of that matter.

The point in considering the evidence is to answer the question of whether, under the evidence introduced by the Greens, they provided a submissible case for their tortious interference with contract claim. It must be remembered that there is no dispute that Beagle was president of the Corporation and an 80% stockholder. While the Greens artfully theorize that Beagle's change in marital status and resulting economic conditions existed, the Greens offered no evidence that the actions taken by Beagle were motivated by such marital and economic changes which, in turn, failed to establish the intent requisite to support their claim for tortious interference with contract claim. The jury and indeed, the court, were left to speculate that such was the motivation and hence the intent of Beagle. In addition, remembering once again that Beagle was the president of the Corporation and an 80% stockholder, there was evidence that since the employment of Terry Green, the business was losing money plus the other matters referred to above. Beagle was, at all times, in a dual capacity as the chief officer of the Corporation and its majority stockholder. It is obvious and not disputed that he had an interest in the economic soundness of the business. In this capacity, Beagle was obviously justified in taking action which, in his judgment, was related to the economic soundness of the business. It should be noted that the contact between Beagle and Green on this issue was in accordance with the notice provisions of the employment contract, and Beagle always represented his capacity as president of the Corporation.

Viewed in a different manner, it can be said that even if Beagle did not exercise sound business judgment or sound management judgment, the evidence reviewed most favorably for the Greens fails to establish that Beagle acted without justification. The lack of sound business judgment is not relevant to the issue. *Nola v. Merol-*

*lis Chevrolet Kansas City, Inc.,* 537 S.W.2d at 634.

It should be recalled that tortious interference with contract is an intentional tort. All elements of the tort must be proven, and "[l]iability under this tort cannot be predicated upon speculation, conjecture or guesswork, and no fact essential to submissibility can be inferred absent a substantial evidentiary basis. A plaintiff must generate substantial evidence supporting each and every element of this cause of action." *Francisco, supra,* 629 S.W.2d at 529, citing to *Tri-Continental Leasing Co. v. Neidhardt,* 540 S.W.2d 210 (Mo.App.1976).

■ As noted above, Greens' evidence failed to establish that Beagle's actions were motivated by his marital and economic changes. Hence, the evidence failed to establish the requisite intent in such tort actions. In addition, as majority stockholder and chief executive officer, Beagle obviously had a bona fide legal economic interest of the Corporation to protect. Beagle's actions, as president of the Corporation, were privileged unless the evidence was substantial to establish that he (Beagle) employed wrongful or improper means to protect that bona fide economic interest. Although Beagle, as majority shareholder, may have benefitted as a result of the termination of the contracts with the Greens, that benefit was only incidental and compatible with the economic interest of the Corporation for which any such action was taken. *City of Warrensburg v. RCA Corp.,* 571 F.Supp. 743, 749 (W.D.Mo. 1983), citing to *Francisco, supra* and *Pillow v. General American Life Ins. Co.,* 564 S.W.2d 276, 282 (Mo.App.1978). Stated another way, if an act or omission is privileged, it cannot be concluded that such act or omission was without justification, absent evidence that improper means were employed which destroyed the privilege. While the evidence might disclose unsound business judgment by Beagle, and indeed even a breach of contract by the Corporation, the evidence must also substantially reveal that Beagle intended to tortiously interfere with the contract for personal, as opposed to corporate, interest plus that Beagle employed improper means which would, in turn, destroy the privilege and establish a lack of justification. The evidence viewed most favorably to the Greens fails to establish the elements of intent and lack of justification. There is absolutely no evidence of any wrongful or improper means employed by Beagle which ended in the termination of the employment contract between Terry Green and the Corporation.

The trial court erred in submitting the Greens' claim for tortious interference with contract because the evidence failed to substantially establish Beagle's intent to tortiously interfere and that Beagle acted without justification. The portion of the judgment awarding actual and punitive damages upon the Greens' claim for tortious interference with contract is reversed.

Since this court has ordered reversal of that portion of the judgment related to tortious interference with contract, points (2), (6), and (7) above are rendered moot.

■ Attention is now directed to the two remaining alleged errors presented by Beagle and the Corporation. The first charges the trial court erred in the submission of the verdict-directing instruction against the Corporation on the issue of breach of contract (point (4) above). The second charges the trial court erred by admitting certain expert testimony on the issue of lost profits.

The disputed instruction reads as follows:

### INSTRUCTION NO. 6

Your verdict must be for plaintiff Terry Green and against defendant Beagle-Chilcutt Painting Company, Inc., if you believe:

First, defendant Beagle-Chilcutt Painting Company, Inc. terminated plaintiff's employment without justification under the employment agreement, and

Second, because of such conduct, defendant Beagle-Chilcutt Painting Company, Inc.'s obligations were not performed, and

Third, plaintiff was thereby damaged. MAI 26.02 [1980 Revision] Modified

**Submitted by Plaintiffs**

The above instruction was submitted upon the issue of alleged breach of contract of the employment contract between the Corporation and Terry Green. In summary, the Corporation argues that said instruction was erroneous because it merely directs the jury to find that the Corporation terminated Terry Green's employment "without justification." It must be noted that termination of Terry Green's employment was never in issue. The real issue was whether the Corporation breached its contract of employment with Terry Green. The Corporation contends that the term "without justification" was employed in the verdict-directing instruction submitted relative to the tortious interference with contract claim. A review of that instruction does, in fact, reveal the use of the term "without justification." From this, the Corporation concluded that the jury was confused and misled by the use of the term "without justification" within the verdict-directing instruction relative to the breach of contract claim. In addition, the Corporation asserts that the instruction was erroneous for the failure of said instruction to include the term "defendant's *contract* obligations" as the same is required by MAI 26.02. The Corporation further asserts that said instruction should have directed the jury to find that Terry Green's employment was terminated under circumstances not prescribed by Section 12 of the employment contract. The Corporation tendered the following instruction which was refused by the trial court:

### INSTRUCTION NO. _

Your verdict must be for plaintiff Terry Green and against defendant Beagle-Chilcutt Painting Co., Inc. in the claim of plaintiff that defendant Beagle-Chilcutt Painting Co., Inc. breached the Employment Agreement if your (sic) believe:

First, defendant Beagle-Chilcutt Painting Co., Inc. terminated plaintiff's Employment Agreement under circumstances not provided for in Section 12 of the Employment Agreement, and

Second, because of such conduct, defendant Beagle-Chilcutt Painting Co., Inc.'s contract obligations under the Employment Agreement were not performed, and

Third, plaintiff was thereby damaged. MAI 26.02 (1980 Revision)

**Submitted by Defendants**

The Corporation concludes that the above instruction, as submitted, gave the jury a roving commission to find for the Greens upon the Corporation's failure to meet *any* obligation when the instruction should have directed the jury to find for the Greens if the Corporation failed to meet its obligations under the employment contract.

The Greens argue that although the term "without justification" was used in both verdict-directing instruction, the jury was not confused or misled by the use of the term in both instructions. They further argue that the employment contract is couched in such broad terminology as to render it vague. It is their further assertion that final argument of counsel clarified the matter for the jury. As to the term or word "contract" having been deleted from the instruction, the Greens argue that by way of final argument, both counsel made it clear that this instruction made specific reference to the breach of employment contract claim. The Greens conclude that the omission of the word "contract" was a mere clerical error by the trial court, and had it been important, "it would have been noticed by at least one of the five attorneys and the Judge ..."

This court is mindful of the admonishment by our state Supreme Court that "[r]etrials are burdensome. There has been in recent years a trend away from reversal for error in instruction, unless there is a substantial indication of prejudice." *Fowler v. Park Corp.*, 673 S.W.2d 749, 757 (Mo. banc 1984).

There is, however, nobody who would suggest that the above statement in *Fowler* is a license to any reviewing court or the trial court to abandon the responsibility of submitting proper instructions.

This particular claim is based upon the alleged breach of the employment contract

between Terry Green and the Corporation. MAI 26.02, the applicable mandatory instruction, specifically reads, "Second, because of such failure, defendant's *contract* obligations were not performed, and, ..." (emphasis added)

The term "contract" has an obvious and purposeful meaning in MAI 26.02, which directs the jury's attention to determine if there was a breach or failure by a defendant to meet its contractual obligation. This term is of critical importance, for failure to include it would allow a jury to find a defendant liable upon the failure of *any* obligation which might or might not be a part of or even related to the contract upon which the plaintiff's claim was based. This court concludes it was reversible error not to include the term "contract" as prescribed by MAI 26.02.

In addition, paragraph "First" of the above-submitted instruction fails to include or disclose the nature of the breach as prescribed by MAI 26.02.

From a reading of the entire transcript, inclusive of the instructions, this court observes that the jury was permitted to apply the term "without justification" and indeed was directed to apply that term in both the tort and breach of contract instructions. It is the conclusion of this court that the use of the term "without justification" in the verdict-directing instruction relative to the breach of contract claim permitted the jury to apply the reasons applicable under the tort claim to that of the breach of contract claim. This was misleading to the jury and the instruction was erroneous.

■ All parties herein are represented by able counsel and counsel argued the issues to the jury in conformity with their capabilities, but final argument by counsel is not curative of an erroneous jury instruction. *Snyder v. Chicago, Rock Island & Pacific Railroad Company*, 521 S.W.2d 161, 165 (Mo.App.1973). This court is also aware of the Greens' reference to *Baccalo v. Nicolosi*, 332 S.W.2d 854 (Mo.1960) and *Wegener v. St. Louis County Transit Company*, 357 S.W.2d 943 (Mo. banc 1962), but finds neither of these cases applicable or controlling. *Baccalo* has no application

because it was a pre-MAI case, and *Wegener* does not apply because, unlike the present case, counsel failed to object to the submitted instruction.

It is obvious that with the disposition reached by this court on the tortious interference with contract claim, there will not be, if this case is retried, a dual submission of the term "without justification" in the instructions. That, of course, does not fully address the question. MAI 26.02 prescribes that the nature of the breach be disclosed in paragraph "First". In addition, the term "contract" is found to be a necessary term to be included in the instruction. The trial court is reminded of these two necessary elements if this matter is retried, and to submit an instruction in conformity with MAI 26.02 as supported by the evidence. Point (4) raised by the Corporation is sustained to its favor.

■ The final point (point (5)) presented by the Corporation charges that the trial court erred in permitting an expert witness for the Greens to testify as to the issue of lost business opportunity and lost profits, because said testimony lacked a sufficient basis.

This issue arose over the Greens' claim that in being wrongfully terminated, Terry Green was denied the opportunity to exercise certain rights under the stock purchase options under the terms of the stock purchase agreement executed by the parties. An expert was called by the Greens who testified to using several financial and contractual documents of both parties herein to construct what, in his opinion, was the financial loss sustained by the Greens.

Unlike the experts who testified in cases cited by the Corporation, the record herein discloses that the expert called by the Greens made detailed use of the corporate records and histories of the particular companies involved herein. It is found that the rule announced by this court in *Chmieleski v. City Products Corp.*, 660 S.W.2d 275 (Mo.App.1983) was, in fact, not violated herein. The Greens' expert testified, without objection, as to his familiarity with the rental business. In addition, unlike the

expert in *Chmieleski*, the Greens' expert had visited the Corporation premises herein and had concluded that the operation he observed conformed to his previous knowledge and experience regarding such an operation. Unlike *Chmieleski*, the expert herein testified as to his familiarity with economic conditions of the area of operation of the Corporation and moreover, he made use of the actual business and financial records of all the parties herein. What the Corporation specifically challenges is the use by this expert of a ten-year depreciation method regarding inventory and equipment, while the record discloses that both the Corporation and Terry Green had made prior use of eight- and six-year periods for depreciation. The expert herein, in minute detail, explained his methodology and the rationale upon which it was based. It cannot be said, as contended by the Corporation, that the methodology was mere speculation and conjecture. It was not inadmissible, but rather, the jury was at liberty to accept it or reject it. The trial court did not err in admitting such testimony. Point (5) is ruled against the Corporation.

That portion of the judgment awarding both actual and punitive damages for tortious interference with contract is reversed in toto and is set aside upon the Greens' failure to make a submissible case for such claims, because they did not submit substantial evidence to establish intent or lack of justification, both of which are requisite elements of tortious interference with contract.

That portion of the judgment awarding damages for breach of contract is reversed and the cause is remanded for further proceedings on the claim of breach of contract only in conformity with the opinion herein.

All concur.